UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| KATHRYN GREEN, ET AL., | ) | CASE NO:  4:16-CV-00893 |
| | ) | |
| Plaintiffs, | ) | CIVIL |
| | ) | |
| vs. | ) | Houston, Texas |
| | ) | |
| HARRIS COUNTY, TEXAS, ET AL., | ) | Tuesday, January 10, 2017 |
| | ) | (10:11 a.m. to 11:21 a.m.) |
| Defendants. | ) | |

MOTION HEARING

BEFORE THE HONORABLE FRANCES H. STACY,
UNITED STATES MAGISTRATE JUDGE

Appearances:          See Next Page

Court Recorder:       Lauren Webster

Transcriber:          Exceptional Reporting Services, Inc.
                      P.O. Box 18668
                      Corpus Christi, TX 78480-8668
                      361 949-2988

Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

2

**APPEARANCES FOR:**


Plaintiffs:                     CHARLES H. PECKHAM, ESQ.
                                Peckham Martin, PLLC
                                800 Bering Drive, Suite 220
                                Houston, TX 77057

                                RANDALL L. KALLINEN, ESQ.
                                Attorney at Law
                                511 Broadway Street
                                Houston, TX 77012

Harris County, Texas:           JULIE A. COUNTISS, ESQ.
                                VICTORIA JIMENEZ, ESQ.
                                LISA R. HULSEY, ESQ.
                                Harris County Attorney's Office
                                1019 Congress, 15th Floor
                                Houston, TX 77002

1      **Houston, Texas; Tuesday, January 10, 2017; 10:11 a.m.**

2                        **(Call to Order)**

3           **THE COURT:**  We're having a hearing about you -- *Green*

4    *versus Harris County*, Number H16-893 and while we're working on

5    that, I'd like the lawyers in that case to approach the bench.

6    Everybody else in the courtroom can continue with their work.

7    Try not to pay attention to us and we'll just have our separate

8    hearing up here at the bench.

9           All right.  Who are all the attorneys in this case?

10          **MR. KALLINEN:**  Randall Kallinen and Charles Peckham

11   for Kathryn Green and David Green and David and Kathryn Green

12   is here.

13          **MR. PECKHAM:**  And she's also a member of the Bar.

14   So --

15          **MS. GREEN:**  Good morning.

16          **THE COURT:**  Good morning.

17          **MS. COUNTISS:**  Julie Countiss on behalf of Harris

18   County, Victoria Jimenez on behalf of Harris County and Lisa

19   Hulsey on behalf of Harris County.

20          **MS. HULSEY:**  Hello, your Honor.

21          **THE COURT:**  How are you all?

22          All right.  So we have a couple issues.  One of them

23   is a few disagreements about a protective order, correct?  And

24   you've maybe been able to work out some of these disagreements?

25   One of them has to do with the information that's already been

1    made public.  You know, the Plaintiff doesn't believe this

2    protective ought to apply to that and some of this wording you

3    think makes that information protected?

4            **MR. KALLINEN:**  Yes, your Honor, because there's no

5    exception for it and there should at least be an exception for

6    documents that we are already, you know, possess, I mean, that

7    have already been made public and take things from the public

8    that may be confidential that's not.

9            **THE COURT:**  Then I suggest that this -- that there be

10   some statement at the beginning or near the beginning of the

11   protective order that makes it clear that the protective order

12   doesn't apply to information that's already been made public.

13           **MS. COUNTISS:**  Your Honor, part of the problem is

14   that we aren't necessarily sure what has been made public

15   primarily because throughout the course of this litigation, the

16   Plaintiffs have made numerous public information requests to

17   Harris County entities while also conducting discovery and so

18   we're not yet -- we are not yet certain what they've obtained

19   through a public information request, you know, versus what

20   they might be asking for in discovery.

21           And, you know, furthermore, we did file a motion

22   yesterday addressing this issue and we don't obviously need to

23   get into it today but, you know, just to say that discovery and

24   public information requests are mutually exclusive and just

25   because something may have come from a Harris County entity --

1    if it wasn't -- you know, if it didn't come in the course of

2    this litigation through discovery, we may not know what it is

3    or whether -- or what information is contained in it and, you

4    know, it's our duty to protect some of those folks.  Excuse me.

5         **(Voices off the record)**

6         **MS. COUNTISS:**  Right, right.  And it -- let me just

7    add that we have asked for that information in our discovery

8    request to Plaintiffs although we have not received it yet.

9         **THE COURT:**  Well, if you did, you know, kind of

10   clarify that.  It might help with the protective order being

11   finalized.

12        **MR. KALLINEN:**  Well, your Honor, Plaintiffs believe

13   that anything that, of course, is public meant -- public under

14   The Texas Public Information Act.  The filing of a Federal

15   lawsuit does not make it anymore, you know, secret or subject

16   to nondisclosure.  As a matter of fact, the case law that we

17   have found shows that once a case is in Federal hands, it

18   actually promotes that the public, you know, see all the

19   documents and is very open, you know, you be very open to the

20   concept that protects so that anything under The Texas Public

21   Information Act is -- that's a minimum of what should be

22   allowed to be, you know, not under the protective order.

23        And as we point out in our response to Harris

24   County's motion for the entry of the protective order, the case

25   law is squarely against all these concepts of secrecy and so

1    forth and it requires that Harris County or the person saying

2    these -- such and such is in secret, that they come up with the

3    law and so forth based upon Federal law, not State law because

4    both the supremacy clause and the Supreme Court has squarely

5    spoken in 1983 cases that openness is what we need, not, you

6    know, closure.  So the case law is squarely for openness and

7    State law, of course, has never trumped Federal law and doesn't

8    in this case.

9             THE COURT:  So doesn't it seem logical that

10   information that has been made public should not be subject to

11   the protective order?

12            MS. COUNTISS:  Again, without knowing -- I can't --

13   I'm not going to just --

14            THE COURT:  Just in theory.

15            MS. COUNTISS:  I mean, in theory, again, it's hard

16   for me to agree with that because it depends on what it is.  I

17   mean, I -- and how it was made --

18            THE COURT:  Okay.  Well, I think that it does not

19   have to be protected by the protective order if the information

20   has been released to the public.  You know, that kind of

21   doesn't make sense.

22            Well, I understand that you don't know which

23   information has and has not been released to the public.  I

24   understand that problem all right and I'd like the Plaintiff

25   to, you know, clarify that for you.  All right -- in this

1    discovery process.  Will you do that, Mr. Kallinen?

2         **MR. KALLINEN:**  Oh.  When we disclose and when we

3    produce, you want us to point out that it was public?

4         **THE COURT:**  If it's information that's already been

5    made public and they don't know -- the Defendants don't know

6    that it already has been made public, then will you please

7    specify that to them?

8         **MR. KALLINEN:**  Certainly.  And would that also apply

9    to anything that would be public under The Texas Public

10   Information Act?

11        **THE COURT:**  Like what?

12        **MR. KALLINEN:**  Oh, let's say like an autopsy report

13   just as an example.  Once there's no law enforcement exception

14   to an autopsy report, it becomes public under the -- you know,

15   under the case law.  So the fact that it's a medical record or

16   something -- the fact that even though we haven't received it

17   yet, if it is something that is public under The Texas Public

18   Information Act --

19        **THE COURT:**  If you have a dispute about the -- if you

20   have a dispute about whether information is public or not,

21   then, you know, that dispute should be resolved first.  Okay.

22   Like you might not necessarily agree an --

23        **MS. COUNTISS:**  Right.

24        **THE COURT:**  -- autopsy report is public information.

25        **MS. COUNTISS:**  Well, I'm not -- I'm actually

1   primarily concerned with, number one, protecting health-related

2   information throughout this litigation, protecting personnel

3   files, particularly of individuals who are not named parties or

4   named Defendants and, you know, that's our larger concern, is

5   protection of information in discovery.

6          THE COURT:  I'd be surprised if those categories of

7   documents have been made public.

8          MS. COUNTISS:  Well --

9          MR. KALLINEN:  Your Honor, even in our suggested

10  protective order, we put in there that people other than the

11  deceased in their public info -- their medical care

12  information, we -- no, we're not going to disseminate that.  We

13  need to get it to our experts to show a pattern and practice of

14  bad medical care at the Harris County jail but we're not going

15  to do anything -- you know, things publicly embarrassing, no.

16  And we already put that in the protective order as we did --

17         THE COURT:  Okay.  Well, what other parts of the

18  protective order are you having a problem agreeing on?

19         Beverly, do I have a copy of that?

20         MR. KALLINEN:  Well, we did set forth our own

21  protective order which --

22         THE COURT:  Beverly --

23         MR. KALLINEN:  -- is much shorter and much simpler --

24    **(Court conferred with clerk)**

25         THE COURT:  Go ahead.

1        **MR. KALLINEN:**  So I'm just trying to get out the

2   particular protective order, your Honor.

3        **MR. PECKHAM:**  What we need is some more paper in this

4   case, Judge.

5        **MR. KALLINEN:**  Yeah.

6        **MS. COUNTISS:**  We've laid out the points for us that

7   appear to be in controversy in Document 19 and we could just

8   march through that.

9        **THE COURT:**  Go through -- go ahead.

10       **MS. COUNTISS:**  So for -- beginning with protected

11  health information --

12       **MS. HULSEY:**  On Electronic Page 3.

13       **MS. COUNTISS:**  -- I'm sorry -- Electronic Page 3 in

14  Document 19.  I think she's waiting for the document.

15       You know, we're asking for the protective order from

16  the Court to -- that expressly identifies protected health

17  information which must be disclosed in response to Plaintiffs'

18  request prohibiting the use of any protected health information

19  produced by the County, whether produced by agreement or

20  pursuant to a Court order for any purpose other than this

21  litigation and limiting access to a disclosure of such

22  information as detailed in the order -- in order in Claims 310,

23  so the County for destruction all protected health information

24  at the conclusion of the litigation.

25       **THE COURT:**  What's the problem with that?

1          **MR. KALLINEN:**  As we've stated before, we have no

2   problem with that, your Honor, and that's what we have in our

3   example.

4          **THE COURT:**  Okay.  So you agree to that position?

5          **MR. KALLINEN:**  Yes.

6          **THE COURT:**  All right.  What's next?

7          **MS. COUNTISS:**  Great.

8          **MR. KALLINEN:**  Except as to our own, you know,

9   Patrick Green's medical records.

10          **MS. HULSEY:**  We've already produced those.

11          **MS. COUNTISS:**  Yes.

12          **THE COURT:**  All right.  What else?

13          **MS. COUNTISS:**  So next would be other nonpublic

14   information.  Their discovery requests seek all sorts of

15   investigative files and production of nonpublic information

16   that has -- includes social security numbers, dates of birth,

17   driver's license, you know, a whole list of very personal

18   information, information that has -- may have to do with

19   informants, victims of crimes, witnesses to crimes and so

20   forth.

21          And we're seeking a protective order that would

22   protect officers and other public employees and contractors --

23   health related and other nonpublic information that we -- you

24   know, that we've produced to be used for any purpose other than

25   this litigation and limits the access and disclosure of all

1    other nonpublic information produced by Harris County which we,

2    you know, anticipate there could be a significant amount of.

3            **MS. HULSEY:**  And those points are at Docket Number 19

4    at Pages 4 through 5 and are included in our proposed

5    protective order.

6            **MR. KALLINEN:**  On that, your Honor, of course, public

7    -- and the concept of what's public and what isn't is a

8    confusing term.  However, I would like to point out that in

9    *Frair* (phonetic) *versus City of Arlington* and in *Zavala versus*

10   *City of Houston*, the Fifth Circuit has said that IAD and

11   personnel files are highly relevant to the case at hand and

12   Defendants have offered no facts suggesting that document

13   should be sealed.  Furthermore, for instance, IAD files are

14   regularly made public through court proceedings citing *Frair*

15   *versus City of Arlington*, Fifth Circuit.  So --

16           **THE COURT:**  I don't think that employee -- other

17   employees' files need to be made public.

18           **MS. HULSEY:**  Those are different --

19           **MS. COUNTISS:**  Right.

20           **THE COURT:**  Why can't you just obtain them in

21   discovery and use them in this litigation?

22           **MR. KALLINEN:**  I mean, we could, your Honor.  That's

23   certainly what we could do.  However, the law is for openness

24   and if we did want to, you know, point out something with what

25   -- how the Government has erred to the public in regards to who

1    they hired or people who have been admonished, these are public

2    things and --

3            **THE COURT:**  Okay.

4            **MS. COUNTISS:**  Can I --

5            **THE COURT:**  I feel like if that becomes necessary, it

6    ought to be addressed by a formal motion, Mr. Kallinen, and

7    that for purpose of discovery, I mean -- and for purpose of

8    your protective order, let's just go with the less -- with the

9    more protected status.  All right?

10           **MR. KALLINEN:**  And at any time, of course, your

11   Honor, we could bring a motion to lift the protective order as

12   pertains to the particular documents currently.

13           **THE COURT:**  Yes, I would recommend that procedure.

14   All right?  I mean, if there's a good reason for making

15   information public, I'm sure that you'll be able to demonstrate

16   it but for discovery purposes, which is what this protective

17   order is about, I'm not making any comment on the merits, you

18   know, or whether ultimately the information needs to be made

19   public but only for purpose of discovery.  I believe that you

20   should keep the personnel information private and use it only

21   for this litigation.

22           Okay, what else?

23           **MS. COUNTISS:**  Well, that sort of combines two

24   sections.  We were talking about other nonpublic information

25   and then the next section is personnel records but ideally

1    those two --

2              THE COURT:  The same --

3              MS. COUNTISS:  -- go together to some extent.

4              THE COURT:  -- the same philosophy applies for me.

5              MS. COUNTISS:  Okay.

6              MR. KALLINEN:  Well, your Honor, I would like to

7    point out, however, that the personnel records are routinely

8    received in a public -- for instance, in criminal cases and

9    through public records requests.  So although it has the word

10   "personnel," it's not really personal.  These are just records

11   of public employees that are put in there and I can -- but for

12   the sake of moving on and getting our documents prior to the

13   statute of limitations, which is up on March 24th, we will do

14   it whatever --

15             THE COURT:  Let's go with the most expeditious and

16   efficient way without saying that -- you know, without

17   foreclosing publication in the future if it becomes appropriate

18   or you can demonstrate why it's a good idea.  Once you see the

19   information, you'll even be more, you know, informed about

20   that.

21             MR. KALLINEN:  Yes, your Honor.

22             THE COURT:  Okay.  Go on.

23             MS. COUNTISS:  And then the -- I think the final

24   section is complaints and other investigative records and I

25   know Mr. Kallinen addressed that because generally when he made

1    reference to some case law -- but there's some significant

2    differences.  For one thing, this case is about -- you know,

3    about Mr. Green becoming sick in the jail, going to the clinic,

4    going to the hospital and passing away.

5           The cases that Mr. Kallinen refers to are excessive

6    force cases typically where individual officers or individual,

7    you know, employees are actually named as Defendants and I

8    would assume the argument was made that the public was somehow

9    entitled to know more about those individuals' maybe

10   disciplinary past or whatever on the basis of the fact that

11   they were named parties and they were clearly connected to the

12   facts of the case where in our situation, you know, these

13   investigative records and complaints are not going to --

14   they're not necessarily going to involve people that are as

15   directly connected or certainly not named parties because there

16   weren't any individual folks named.

17           **MR. KALLINEN:**  Your Honor, once again, as we all

18   know, in order to get the government liable, we have to show a

19   pattern of practice.  If Harris County wants to say they'll

20   forego that finding of pattern or practice to get their

21   liability, we'll accept that.  However, they probably won't.

22   So in that regard, we need to get all of the -- all the similar

23   -- you know, similar cases including the failure to discipline

24   and so forth.

25           There's been many cases where individuals -- for

15

1   instance, there was two criminal cases where individuals did

2   not make their rounds and did not treat this mentally ill

3   individual correctly and then there's other examples but -- so

4   as long as we get all the documents, we can, I guess, go with

5   the same as before.  You know, if we want to do something with

6   it more public, then we could do that in a motion.  However, we

7   would like to, you know, receive all the documents because they

8   go to pattern and practice.

9           **THE COURT:**  Are we talking about a protective order

10  or a discovery issue?

11          **MS. COUNTISS:**  I'm just talking about the protective

12  order.

13          **MR. KALLINEN:**  Yeah.

14          **MS. COUNTISS:**  I'm just talking about -- I'm just

15  replying to his -- the cases that he cited as the type of cases

16  that the public -- you know, where the public needs -- or they

17  believe needs to have more access to, you know, information

18  that -- type of information that we're saying we would like

19  protected.

20          **MR. KALLINEN:**  And, of course, Plaintiff says that

21  many people dying in the Harris County jail is a public

22  interest just like they're getting shot on the street is a

23  public interest because it has to do with governmental

24  practices and policies.

25          **THE COURT:**  Okay.  Well, are there other parts of the

1    protective order that we need to talk about?

2              **MS. HULSEY:**  Well --

3              **THE COURT:**  Or --

4              **MS. HULSEY:**  -- just to clarify, your Honor --

5              **THE COURT:**  Yeah.

6              **MS. HULSEY:**  -- I think that Mr. Kallinen has agreed

7    that at -- looking at our motion, Document Number 19 at Page 6

8    under Paragraph Number 8, Complaints and Other Investigative

9    Records -- and I'm sure he'll correct me if I'm wrong -- I

10   think he's agreed that for purposes of discovery, Plaintiffs

11   are fine with including these in the protective order.  What

12   they want is disclosure, relevant materials in response to

13   their discovery request and should they feel the need may arise

14   later to go public with whatever, they will apply to the Court.

15             **THE COURT:**  Okay.

16             **MS. HULSEY:**  I think that's what you said, Randall.

17   Is that correct?

18             **THE COURT:**  Here's what I'd like to do.

19             **MR. KALLINEN:**  Well, it's -- yes, as long as this

20   facilitates the moving along and the statute of limitations,

21   which comes on March 24th after this case was filed in April of

22   this year, that would be -- you know, that would be fine but --

23             **THE COURT:**  Okay.  Well, here's what I'd like the

24   parties to do.  Try to submit an agreed protective order.  If

25   you -- if there are parts of it still that you don't agree on,

1    I'll resolve it.  I'll resolve it but how soon can you get me

2    the final draft?

3            **MS. HULSEY:**  Your Honor, if I could -- I'd like to

4    insert here.  We have included as an attachment to Document

5    Number 19 a proposed protective order that we provided to

6    Plaintiffs' counsel and which addresses each one of the issues

7    we've just discussed here today.  And I think it does --

8            **THE COURT:**  Including the public information --

9            **MS. HULSEY:**  Yes.

10           **THE COURT:**  -- on it?

11           **MS. HULSEY:**  And so perhaps they could review that --

12           **THE COURT:**  Yeah.  Well, you guys do that and get it

13   to me by this time tomorrow and if there are still parts of it

14   you don't agree on, I will, you know, make a decision and I'll

15   enter the protective order.

16           **MS. HULSEY:**  Thank you, your Honor.

17           **THE COURT:**  Okay.  By this time tomorrow, is that too

18   soon?

19           **MS. HULSEY:**  Your Honor, if possible, could we have

20   two days?  I have a filing deadline today and I know I will

21   want to look at it.

22           **THE COURT:**  Uh-huh, yes, two days.

23           **MR. KALLINEN:**  Two days will be fine.

24           **THE COURT:**  So today --

25           **MR. PECKHAM:**  There are a lot of eyes looking at it,

1    Judge.  So --

2            **THE COURT:**  -- is the 10th.  Tomorrow is the 11th.

3    Say, by the close of business on the 12th?

4            **MR. KALLINEN:**  Sounds good.

5            **MS. HULSEY:**  Yeah, that would be great.

6            **THE COURT:**  So I can enter it on the 13th?

7            **MS. HULSEY:**  Oh, that would be wonderful.

8            **MR. KALLINEN:**  That would be great.

9            **MR. PECKHAM:**  Friday, the 13th, Judge?

10           **THE COURT:**  Oh, it's a lucky day, right?

11           All right.  So now we have some discovery issues to

12   talk about but not as many as I thought we would have to.

13           **MR. PECKHAM:**  You should -- we're all patting

14   ourselves on the back that we --

15           **THE COURT:**  All right, I'll pat you, too.  I'm very

16   happy when you can work out discovery disputes.

17           Now, I'm looking at Page 2 of the County's opposition

18   to the Plaintiffs' motion to compel.

19           **MR. PECKHAM:**  That's what I have, Judge.

20           **THE COURT:**  And there's a Paragraph 3 that has the

21   things that are still in controversy?

22           **MR. PECKHAM:**  Yeah, I think one of those is actually

23   gone based upon production since that time but we'll hit it as

24   we go if that's okay.

25           **THE COURT:**  Yes, it is.  Go in order that you like.

1          **MR. PECKHAM:** Judge, Charles Peckham and I want to

2    talk a little bit about the motion.  I think it's helpful to

3    have a little bit of a background.  As the Court is aware from

4    the -- been involved in the case now for some time, Patrick

5    Green died on March 25th, 2015.  He was a Baylor graduate.  He

6    had some problems with drugs that -- after school, an addiction

7    which put him in the Harris County jail.  He was a good kid.

8    His parents are both lawyers.  His uncle is on the Texas

9    Supreme Court.  This is not a family that's going to go away

10   lightly and that's part of why this got involved so quickly.

11          On the 25th, as a friend of the family, who's also a

12   lawyer, sent a letter -- a legal-hold letter to Harris County

13   to Vince Ryan as well as to the Sheriff asking for a legal hold

14   on various documents and information.  As the Court is well

15   aware, one of those things was videotapes.  The County took the

16   position that because this legal-hold letter was a threat of

17   litigation that they would hold on to and not produce.  They

18   fought that battle with the Attorney General and the Attorney

19   General's office and in June of 2016, about, well, a year and

20   two months later, Harris County wrote a letter to the Attorney

21   General saying, the matter is now moot because we've destroyed

22   the videotapes.

23          So now we're in a position, Judge -- and I think what

24   we're looking at on the Table of Contents is Request for

25   Production Number 4.  So it's A and H.  And so it's the first

1    and the last that's on their list.

2             The first has to do with the videotapes and that's

3    Request for Production Number 4.  We've requested videos.

4    We've gone to great lengths to try to obtain videos.  We

5    understand that there was an Internal Affairs investigation.

6    There were other investigations perhaps by the District

7    Attorney's office which I think somebody sent a PIA request, a

8    Public Information Act request --

9             **THE COURT:**  Yeah.

10            **MR. PECKHAM:**  -- to the District Attorney in December

11   and that's what they filed their motion on last night.  So

12   we've gone through all kinds of activity to try to get the

13   information.  If the videotapes don't exist -- if they have

14   actually been destroyed by Harris County, then at least for

15   request for Production Number 4, we need to have some kind of

16   an idea as to the chain of custody for those videotapes.

17            We know they were made.  We -- although Harris County

18   denies at some point that they existed, that they were made,

19   they represented to the AG that they were destroyed and we have

20   testimony under oath from other inmates saying video cameras

21   were there.  So it's not just important to the pod where

22   Patrick was to see whether he was on that videotape but there

23   are I-60s -- now, I'm not sure, of course, where -- please, if

24   I'm insulting your intelligence, stop me but I-60s are

25   effectively a complaint mechanism by inmates to say, I need

21

1   some medical care and they're put on a piece of paper and

2   they're slipped into a box outside of the pod and that in

3   itself is on videotape.

4           So we have testimony from inmates that that existed,

5   that an I-60 was made, that Patrick Green complained, that

6   others complained on his behalf and so we can't get any of that

7   information from Harris County and that's Request for

8   Production Number 4 and that's been the subject of Public

9   Information Act request.  That has been -- in fact, I think the

10  AG is taking the position with us now that that needs to be

11  produced but we don't have it and if you don't have it, we need

12  some kind of an explanation as to who got the videotapes, how

13  they were destroyed, where they went, are there other people

14  that may now have them, for example, that have not been

15  disclosed to us.  We need to have that information.

16          So I'm going to segue into the inspection.  Not only

17  is the failure to produce those videotapes important for an

18  inspection, the inspection is important on its own right.  We

19  know that there are videotapes.  There are monitors and there

20  are people watching them.  So we need to see, first, where the

21  videotapes are played, where the video --

22          **MR. KALLINEN:**  Cameras.

23          **MR. PECKHAM:**  -- cameras --

24          Thank you very much, Randall.

25          -- are placed.  We also need to see where the

1    monitoring occurs.  We also need to see site lines between the

2    -- where the detention officers were placed and where Patrick

3    Green was in his cell.  All of those things are remarkably

4    important as well as the placement of the medical box for I-60s

5    as well as any other complaint box.  Those are all dramatically

6    and remarkably important for this case so that we can show

7    exactly what happened and it wasn't just March 25th but in the

8    week prior and even a little bit before that.

9           So that's what we've asked for.  In fact, on Request

10   for Production Number 4 regarding videotapes, we've asked for

11   it for, you know, less than ten days -- for eight days.  We're

12   very specific about what we're seeking.  So if we can't get

13   that, we need the inspection now.  Originally, Harris County

14   agreed to an inspection and were going to get us protocol and

15   then they decided at the last minute that they didn't want to

16   do that either.  So that went back on our list of contested

17   matters.  That's where we are today.

18           **MS. COUNTISS:**  Can I address a few things --

19           **THE COURT:**  Yes.

20           **MS. COUNTISS:**  -- before we get too far into it?

21   First of all, I'm actually kind of -- I'm confused because

22   Plaintiffs' Request for Production Number 4 does not ask for

23   what they're saying it asks for and so this discussion about

24   focusing Discovery Request Number -- I mean, Request for

25   Production Number 4 around videos of the -- somewhere in the

1    jail is not -- I mean, this request does -- asks for documents,

2    videos, recordings, yada, yada that are a part of the personnel

3    file of any and all the jail guards and then it's covering a

4    one-year time period from March 18, 2015 to March 26, 2016.  So

5    I --

6              **MR. PECKHAM:**  I apologize.

7              **MS. COUNTISS:**  -- I'm unclear about -- I mean, I

8    think he might be refer -- I think they might be referring to a

9    different request?

10             **MS. HULSEY:**  They're referring -- I believe they're

11   referring to a different request that we're all working on

12   because Request Number 4 goes into jail guards, detention

13   officers, other employees' or contractors' files.

14             **MS. COUNTISS:**  And then secondly, as to the PIA

15   portion of the argument, the Public Information Act, I mean, we

16   don't -- I don't handle Public Information Acts.  We have

17   people who do.  Counties -- County entities have people in

18   their departments who handle that and they don't all come

19   through our office and as counsel pointed out, if they're

20   unable to, you know, get what they want, they have a remedy

21   through the AG's office, among other things, but that's

22   separate and apart from the discovery process that we're trying

23   our best to go through in a way that protects the people that

24   need to be protected, you know, and allows for open -- you

25   know, open and clear discovery but with some guidelines and

1    some rules of engagement.

2            And that's kind of been the problem is this very,

3    very murky line between what's -- you know, what PIA requests

4    Harris -- you know, Harris County didn't answer the way they

5    wanted versus those of us who are the lawyers on this case who

6    are responding to discovery requests.  And so -- and then I

7    guess we went into the inspection part as well.  We didn't -- I

8    mean, it's a bit of a stretch to say that we had agreed to an

9    inspection.  We discussed it in the phone conference.

10           We initially said we would put our heads together and

11   see if there was a protocol we could come up with that would --

12   you know, that would be satisfactory.  We weren't able to --

13   amongst ourselves weren't able to do that and came to a

14   different conclusion that wasn't -- it wasn't that we, you

15   know, strung them along or anything like that and in particular

16   because there's nothing about the facts of this case that in

17   any way warrant that level of intrusion into a jail cell that

18   is, for one thing, not the same as it was when Mr. Green was

19   there a year ago -- more than a year ago but in particular

20   because there was no incident.

21           There was no -- this wasn't a jail extraction case.

22   This wasn't an inmate fight.  Mr. Green was -- became ill.  He

23   was taken from his cell to the clinic.  He was taken from the

24   clinic to the ambulance.  He was taken from the ambulance to

25   the hospital.  He passed away in the hospital and so there was

1   no -- there's no triggering event that happened in that cell

2   that any photos or video is going to show.

3          THE COURT:  That's your perspective but I can

4   understand the Plaintiff has a different perspective on that.

5          MS. COUNTISS:  Of course.

6          THE COURT:  And so an inspection might be warranted

7   but I think it's more useful to go number by number and -- so I

8   can decide how to resolve your disputes.

9          MS. COUNTISS:  Okay.

10          THE COURT:  All right, let's talk about Request for

11   Inspection and Request for Production Number 4.  You say that's

12   about employee videotapes, not about a video of the cell?

13          MR. PECKHAM:  And, Judge, if I can interject.  Three

14   was more about videotape of the cell.  Four is about videos of

15   -- related to personnel files and I think what we're talking

16   about are trading -- you know, not -- as the Court knows,

17   institutions all over have -- and I don't know whether Harris

18   County has done this or not but we'll find out certainly but

19   lots of institutions but lots of institutions put their

20   training on videotapes for a repetitive nature and things like

21   that.  We -- those would be things that we would be looking for

22   here.

23          I find it kind of interesting because I don't --

24   there really isn't good legal objection to what they're saying.

25   We've got a protective order now that's going to be in place to

1    protect this information and when we're dealing with

2    proportionality when we're trying to deal with *Monell* and a

3    pattern and practice, we certainly need to get that continuing

4    training regarding the policies and procedures from Harris

5    County.

6            **THE COURT:**  Okay.  So what's -- do you have an

7    objection to that?

8            **MS. COUNTISS:**  I know.  Your Honor, the issue with

9    Number 4 is how hugely, hugely broad it is in time and in terms

10   of all of the personnel that could possibly be involved.

11   They're asking -- I mean, it -- and -- you know, he wasn't

12   really even able to describe what kind of videos he was looking

13   for but apparently whatever it is, they're going to be along

14   with all these other things that are part of the personnel file

15   of any and all the jail guards, detention officers or other

16   employees or contractors of Harris County, not even limited to

17   just the jail that he was in but who guarded or observed his

18   cell inmates and then I'm -- again, I'm unclear -- we're

19   unclear about the timeframe.  I mean, if it's a typo, that

20   would be great to know but I can't guess that.  It says --

21           **THE COURT:**  Okay.

22           **MS. COUNTISS:**  -- a year's worth of records.

23           **THE COURT:**  How would you know that?  You were saying

24   it's narrowed because you described the type of employees.

25           **MR. PECKHAM:**  That's right.

1          **THE COURT:**  And what timeframe are you talking about?

2          **MR. PECKHAM:**  And, Judge, I think it's probably

3    helpful -- and I don't think this is a typo but I think we can

4    limit it to -- if we're dealing with those who guarded or

5    observed Patrick, his cell and inmates, then those that would

6    have been on the personnel files and training and the

7    information of those people who were on duty between March

8    18th, 2015 and March 26th, 2015 because we're dealing with -- I

9    think that it potentially was a typo because we're dealing with

10   the date of death being March 25th.  So I think that may be a

11   typo.  It should have been one week or eight days.

12          **THE COURT:**  All right.

13          **MS. HULSEY:**  So, your Honor, what they're seeking are

14   complete personnel files, all documents, videos, recordings,

15   photos, intangible things that comprise or are part of the

16   personnel file of any and all jail guards, detention officers

17   or other employees or contractors of Harris County who guarded

18   or observed Patrick Green, his cell and inmates housed in his

19   cell from March 18, 2015 to now, March 26, 2015.

20          We have three shifts of officers and you have a

21   couple officers in the pod on the first shift.  You have one in

22   the pod on the second.  You have one in the pod on the third

23   shift.  You have four rovers working that floor the first

24   shift.  You have four rovers working the second shift.  You

25   have three rovers working the third shift.  So right now we're

1   up to --

2          **MR. PECKHAM:**  Fifteen

3          **MS. HULSEY:**  -- two, four -- 15 and then you have

4   other personnel.  You have lots of other personnel.

5          **THE COURT:**  Have you identified those personnel?

6          **MS. HULSEY:**  We've identified some of those personnel

7   but we have not identified all nor could we identify all.

8          **THE COURT:**  Okay.  Well, I don't think that sounds

9   over-burdensome or overbroad.

10          **MS. COUNTISS:**  And, your Honor, there are some

11   specific individuals whose -- who gave -- who are either --

12   this is the -- right?

13          **MS. HULSEY:**  Yes.

14          **MS. COUNTISS:**  Well, that would be not the same.  Is

15   that the same?

16          **MS. HULSEY:**  Yes, that'll work.

17          **MS. COUNTISS:**  -- who are mentioned, like, for

18   example, in the Significant Event Bulletin and then some who

19   gave statements in connection with -- you know, with the -- I

20   guess, the investigation that went on.  Those are all -- you

21   know, those are clearly identified were people and that's a

22   much smaller number than if we had to walk -- you know, if we

23   had to determine how many employees and contractors in Harris

24   County observed him during, you know, that time period.

25          **THE COURT:**  I think you should try.  It's not a long

```
 1   time period.  It's --

 2           MS. HULSEY:  Well, it was until --

 3           MS. COUNTISS:  Well, yeah, it -- I mean, it was --

 4   that was part --

 5           THE COURT:  No, it's not.

 6           MR. PECKHAM:  Judge, we'll happily expand it.

 7           THE COURT:  Yeah.

 8           MS. COUNTISS:  That does -- yeah, that makes a

 9   difference for sure.

10           THE COURT:  No, it's not.  I think you should make an

11   effort to satisfy that request as modified, okay, as we

12   discussed on our record here.

13           Let's talk about Number 19.

14           MR. PECKHAM:  I think, your Honor, we have gotten all

15   the pass-on sheets and we asked for them under a different name

16   but they're effectively pass-on sheets.  We think we have them

17   all and so at least for this hearing, let's move past 19.  I

18   think we're okay with that.

19           THE COURT:  Okay.  Twenty-six.

20           MR. PECKHAM:  Well, 26, 27 and 29 are related.

21           THE COURT:  Okay.

22           MR. PECKHAM:  And they deal with -- Patrick Green

23   died from meningitis and there is -- I think I saw somewhere in

24   the response that there was an allegation that perhaps he had

25   obtained meningitis from a newly obtained tattoo.  We know from
```

1   the autopsy there was no new tattoo.  The only thing was some

2   bruising from a kicking that he received from Detention Officer

3   Ervin.  So -- and that was as he was -- he just couldn't move.

4           Meningitis, as the Court is probably aware, is

5   something that doesn't come on all of a sudden.  It occurs over

6   a period of days and it also doesn't come on from no spur.

7   There's a trigger for it and typically that is some kind of

8   bacterial infection that occurs.  So we're dealing with

9   questions about -- 26 we're dealing with ventilation and

10  records regarding cleanliness, et cetera for ventilation.

11          Twenty-seven we're dealing with mold and viral growth

12  reports, anything that's out there regarding, you know,

13  cleanliness and that leads into 29 which were -- which are

14  cleaning procedures.  Who's doing the cleaning, what the

15  procedures are and that kind of matter for a period of time and

16  it -- if the Court looks at those requests, we're dealing with

17  -- for a time period from January 1, 2015 to March 25th of

18  2015.  It's a three-month period of time.

19          Patrick was placed in custody December the 31st of

20  2014.  So we're really dealing with a three-month period of

21  time.  That's what we're seeking because if we're dealing with

22  *Monell*, we want to deal with the pattern and practice regarding

23  the ventilation, cleanliness, mold and viral growth reports and

24  it's my understanding that there have been other instances in

25  Harris County of difficulties regarding cleanliness and

1   sickness of inmates.

2         **THE COURT:**  Okay.

3         **MS. COUNTISS:**  Your Honor, Mr. Green didn't -- he

4   died of acute bacterial meningitis which is far different, for

5   one, than meningitis.  Both are awful but the usage of the

6   words "acute" and "bacterial" make a huge difference in terms

7   of his cause of death.  In fact, it was determined, you know,

8   upon autopsy, the symptoms he presented with were altered

9   mental status but aside from that, no one else in -- anywhere

10  in any Harris County facility during that time period

11  contracted meningitis -- bacterial meningitis -- acute

12  bacterial meningitis -- no one in his cell and, in fact, you

13  know, in our searching going back five or six years, there are

14  no other cases of acute bacterial meningitis in the jail.

15        It is -- it was determined that what he had was not

16  contagious.  They did, of course, initially quarantine the cell

17  to -- you know, to confirm but once that -- once the medical

18  personnel and experts confirmed that, you know, the type that

19  he had, it was very clear then that it was not a contagious

20  form.  Also, no one else contracted it.

21        That being said, again, a more limited in-scope

22  request that doesn't encompass every single Harris County

23  facility considering that the only one at issue is the, you

24  know, 701 San Jacinto might be a more reasonable approach.  We

25  might -- potentially we could agree to produce only as to that

1    Pod 3C that -- yeah, Pod 3C at 701 San Jacinto, you know,

2    during a relevant time period as opposed to -- sorry, I have to

3    find the -- yeah, as opposed to in the jail which was to

4    encompass Baker Street and numerous other facilities.

5            **MS. HULSEY:**  There's a 1200 Baker Street jail, 701

6    North San Jacinto jail, 711 North San Jacinto jail, 1307 Baker,

7    all the substations which have little jail-holding facilities

8    in them.  So we're not limited -- this discovery request is not

9    limited in scope to 701 or the third floor of 701.

10           **THE COURT:**  What's your position on that?

11           **MR. PECKHAM:**  Certainly.  I think it's interesting

12   that they want to limit it.  That tells us that perhaps there's

13   something else there.  When we're dealing with pattern and

14   practice though, your Honor, we're not dealing with pattern and

15   practice regarding a pod.  We're dealing with pattern and

16   practice regarding Harris County and so when we're dealing with

17   that, we're dealing with rules, policies, practices that deal

18   with multiple holding facilities and jails, not just this one,

19   not just this pod.

20           **MS. COUNTISS:**  But it's a -- it's not just a pattern

21   or practice of something that makes the County look bad.  It's

22   a pattern and practice that goes to deliberate indifference to

23   serious medical needs.  That is what this case is about.  That

24   is -- you know, we are resisting issues in production related

25   to the case itself and that doesn't prevent them establishing a

33

1   pattern and practice if they're able to but to just broadly

2   continue to throw out the word "pattern and practice," we need

3   everything from everywhere because that way we can figure out,

4   you know, what our pattern and practice is going to be is far

5   beyond the scope.

6           THE COURT:  All right.

7           MS. HULSEY:  And, your Honor, if I may add.  At

8   Docket Number 25, Page 19, we cite the *Brown versus Harris*

9   *County, Texas* case.  It's a case, I believe, decided by Judge

10  Rosenthal in the District Court, 2010 Westlaw, 774138 at Page

11  11 and Judge Rosenthal said, "While Brown's evidence shows a

12              general pattern of overcrowding in detention

13              facilities in Harris County, the evidence does not

14              show a pattern of incidents of inmate-on-inmate

15              sexual assaults at the Harris County jail area where

16              Brown was housed."

17          Now, that decision by Judge Rosenthal was affirmed by

18  the Fifth Circuit at 409 Fd.App 728.  That's a Fifth Circuit

19  2010 opinion.  And again -- or what I should say is that the

20  Court looks for similar incidents and Judge Rosenthal in *Brown*

21  said, you look at the area where the individual was housed.

22          THE COURT:  Okay.  What's the time --

23          MR. PECKHAM:  Can I -- all right.

24          THE COURT:  -- what's the time period you're asking

25  for?

34

1          **MR. PECKHAM:**  We've asked for January 1, 2015 to

2   March 25th, 2015.  That's a three-month period of time or

3   slightly less and -- if I may.  I mean, it seems to me that

4   this is going to be a fairly limited amount of information.

5   We're not talking about something hysterically overbroad.

6          **THE COURT:**  I wonder if there even is any information

7   about mold studies in a prison.

8          **MR. PECKHAM:**  And there may not be but it's a

9   question for us.  It's a question --

10          **THE COURT:**  Right.

11          **MR. PECKHAM:**  -- that -- it was a question of

12   admissibility.  It's a question of discoverability.

13          **THE COURT:**  Correct.

14          **MS. COUNTISS:**  And, again, we're willing -- we can

15   certainly agree to produce as to the 3C at 701 San Jacinto,

16   your Honor, in that timeframe.

17          **THE COURT:**  Okay.  I'm not going to make it that

18   narrow --

19          **MS. COUNTISS:**  Okay.

20          **THE COURT:**  -- but I'll make a decision.  What about

21   Number 33?

22          **MR. PECKHAM:**  You've got to flip the pages, Judge.

23   Your Honor, again, and I know Harris County doesn't like me to

24   throw out the words "pattern and practice."  That's always a

25   dispute in these cases but we're dealing with, again, training

1    of medical personnel, training of personnel in the jails,

2    guards, detention officers with respect to identification and

3    treatment of lethargy, altered mental status, sepsis, viral and

4    bacterial meningitis.

5              Every college, every elementary school, every middle

6    school, every high school and certainly every jail has some

7    kind of policy or procedure with respect to identifying people

8    who are showing evidence of meningitis because it's such a --

9    respectfully, a killer and it has to be identified and so those

10   -- that kind of information, I think, is terribly important.

11             **THE COURT:**  Okay.  And you have a problem with

12   producing that training -- or that policy?

13             **MS. COUNTISS:**  Well, we -- it's more about the scope

14   of the request, your Honor.  We -- there are medical personnel

15   who are involved who are certainly going to be, you know,

16   licensed in accordance with State standards.  There are

17   detention officers who are actually licensed and certified

18   pursuant to State standards under TCOLE.

19             The detention officers though, however -- you know,

20   they're not medically trained.  They're certainly not

21   considered medical personnel and it's not that we -- you know,

22   we just need to narrow -- we'd like to narrow this down so that

23   it's specific as to TCOLE training, certifications for the

24   detention officers which would -- you know, would logically

25   include what topics they were trained -- you know, trained on

1    in order to have their license and keep their license and same

2    with the clinic personnel that were working in -- or interacted

3    with, you know, Patrick Green in the jail.

4            So it's more about the scope of all documentation

5    reflecting the training, you know, this sort of unidentified

6    medical personnel, guards, officers, contractors.  You know,

7    we're just hoping to narrow this down to something a little

8    more doable.

9            **MR. PECKHAM:**  And I --

10           **MS. COUNTISS:**  Do you have more to add?

11           **MS. HULSEY:**  And --

12           **MR. PECKHAM:**  Oh, I'm sorry.

13           **MS. HULSEY:**  -- I'm sorry.  Let me finish.  It's not

14   limited at all in time and otherwise not limited in scope and

15   it basically asks for the world in terms of -- or amorphously

16   asks for the world in terms of training.  I think what we're

17   looking for is something on a much more limited basis, TCOLE

18   records relating to certain specified officers, that type of

19   thing.

20           **MR. PECKHAM:**  Judge, it --

21           **THE COURT:**  All right.  What's your response?

22           **MR. PECKHAM:**  Absolutely.  In 2009, there was a

23   Justice Department investigation that identified training of

24   medical personnel, training of detention officers, training of

25   contractors in the jail as a problem and I think if we wanted

1   to do that, we could limit it in time as to include and go

2   forward from the date of that 2009 Justice Department

3   investigation.

4              THE COURT:  Until when?

5              MS. HULSEY:  And we do not agree to that and I might

6   add, as far as this DOJ letter he's referring to, it was a

7   notice letter noticing the DOJ's intent to file suit.  The DOJ

8   never filed suit over that.

9              THE COURT:  Okay.  Well --

10             MR. PECKHAM:  Mr. Peckham, I believe, had --

11             THE COURT:  -- from 2009 until when?

12             MR. PECKHAM:  Until -- remind me -- the 26th of March

13  of 2015.

14             THE COURT:  Do you have a comment?

15             MR. KALLINEN:  Oh, your Honor, I just wanted to

16  mention that whether somebody or not has a certain list of

17  TCOLE -- there's these lists of TCOLE classes taken.  That

18  won't tell anything about whether their training is specific

19  enough to identify this.  There's no case law that says TCOLE

20  training prevents cases of deliberate indifference for, you

21  know, medical -- for medical care.  And so I just wanted to

22  point that out that we need all the medical records and --

23             THE COURT:  And you need what?  I'm sorry.

24             MR. KALLINEN:  All the training records.

25             THE COURT:  The training records.

1      **MR. KALLINEN:**  The training records.  And as far as

2  going back in time, we'll need the training records like -- for

3  instance, if we're restricted in time, they might have had some

4  training 20 years ago which is, you know, good training and if

5  we did go back five years and say, ah ha, you didn't have any

6  training, then at trial, they jump up and say, yes, look at

7  this 20-year-old record.  Did you forget any of those

8  trainings, sir?  No, we didn't.  So in other words, we need to

9  see what their training was no matter when it was, not what was

10  recent.

11      **MS. HULSEY:**  And, your Honor, if I may respond.

12  There is no failure to train claim in Plaintiffs' live pleading

13  in their First Amended Complaint.  Secondly, as far back as

14  *Benavides versus*, I think, *County of Wilson*, something like

15  that, the Fifth Circuit has held that so long as training

16  complies with the State regulations, then the training is, per

17  se, adequate and Constitutional.  So --

18      **THE COURT:**  Okay.  Well, this is likely to lead to

19  discoverable evidence.  So I think you should respond from --

20  for -- with training records for the people described between

21  the date of the DOJ letter in 2009 until March 26th, 2015.

22      **MS. HULSEY:**  What specific people, your Honor?

23      **THE COURT:**  How did you describe them?

24      **MR. PECKHAM:**  Let's see.  Training of medical

25  personnel, guards, detention officers and contractors of the

1    jail, period, is how we identified it.

2              MS. COUNTISS:  So are we talking about -- I mean, I'm

3    -- again, you've already said how you're ruling, your Honor.

4    So I've got to be clear on this because I'm confused.  So are

5    we talking about per person?  So from 2009 to 2016, you know,

6    we identify every Harris County medical personnel, Harris

7    County guard, detention officer and contractor of any Harris

8    County jail and then we produce the training for each of them

9    because I can't possibly --

10             THE COURT:  Is that what you're asking for?

11             MR. PECKHAM:  That's -- yeah, that's -- I think

12   that's a little bit much.  I think what we're looking for is

13   the training manuals, training information that's given to jail

14   personnel and I think that the previous --

15             THE COURT:  I think it's a policy thing.

16             MR. PECKHAM:  Right.  I think the previous request

17   when we asked about personnel records specifically, it covered

18   those specific individuals who --

19             THE COURT:  For the narrower group of people.

20             MR. PECKHAM:  That's correct.

21             THE COURT:  All right.

22             MS. HULSEY:  Your Honor, you're going to put your

23   order on this one in writing, correct?

24             THE COURT:  Yeah, yes, uh-huh, I am.

25             So we're looking for you to produce the type of

1    training and of what -- not on a specific employee basis but

2    what is the training of your personnel who are guards or clinic

3    employees -- is that how you described them?

4              **MR. PECKHAM:**  That's correct.

5              **MS. COUNTISS:**  Does that include --

6              **THE COURT:**  Does he recognize --

7              **MS. COUNTISS:**  I'm sorry.

8              **THE COURT:**  -- symptoms of bacterial meningitis --

9              **MR. PECKHAM:**  Yeah, we --

10             **THE COURT:**  -- from the day of the DOJ letter in 2009

11   until March 26, 2015?

12             **MS. COUNTISS:**  Just bacterial meningitis?  Their

13   request involves lethargy, altered mental status, sepsis --

14             **THE COURT:**  All of that, right.

15             **MR. PECKHAM:**  That's right.

16             **THE COURT:**  What kind of training does your -- what

17   does your policy instruct them --

18             **MR. PECKHAM:**  To do.

19             **THE COURT:**  -- to recognize --

20             **MS. COUNTISS:**  And -- I'm sorry.

21             **THE COURT:**  -- and how -- taught to act?

22             **MS. COUNTISS:**  Okay.  Specific to Harris County's --

23   so in other words, I don't -- again, I'm just -- so for

24   example, a nurse in a clinic --

25             **THE COURT:**  Right.

1      **MS. COUNTISS:**  -- she's also -- she's also -- her

2  licensing by the State involves that -- those topics.  Is that

3  also something we need to be producing in this or do they just

4  want to know what Harris County tells people they hire to do in

5  regards to -- or doesn't tell or --

6      **THE COURT:**  It's about what the County tells them.

7      **MR. PECKHAM:**  And, your Honor, of course, I know it's

8  -- we have to kind of explore the parameters but to take it to

9  an illogical conclusion would be to require them to go out and

10  find out what training those medical officers got from their

11  colleges, their medical school.  That's not --

12      **THE COURT:**  That's not what I'm anticipating that you

13  do --

14      **MR. PECKHAM:**  Sure, right.

15      **THE COURT:**  -- at all.

16      **MS. COUNTISS:**  Okay, great.  I mean, I -- because I

17  can only read --

18      **THE COURT:**  That's not what the lawsuit is about.

19      **MS. COUNTISS:**  -- how it's written.

20      **THE COURT:**  That's not what the lawsuit is about.

21      All right, what's next?

22      **MR. PECKHAM:**  Forty-two, Judge, and 43.  Forty-two

23  and 43 are a little bit different --

24      **THE COURT:**  Okay.

25      **MR. PECKHAM:**  -- but 42 has to do with any

1    documentation regarding face-to-face contact with, observation

2    of each inmate in that particular pod, including Patrick, for a

3    25-day period, March 1st to the 25th.  That's it.  So we can

4    obtain from that information hopefully, Judge, a trail of what

5    the training was and the pattern and practice.  We know that

6    there has been a question of Harris County in the past

7    regarding the ignoring of their own training as a custom and

8    the ignoring of inmates as a custom.

9              In this case, for example, we have obtained

10   statements from inmates -- and typically, Judge, we don't, you

11   know, write an affidavit and say, here, sign this.  Typically

12   what we'll do is we'll take a court reporter out and talk to

13   somebody and say -- as a recorded statement and say, what did

14   you experience in jail, which we have done and three of those

15   people have told us that they were ignored in the jail.  They

16   obtained retribution in the jail when they -- after the

17   investigation.  Some of the jail officers, they believe, were

18   retaliating against them.

19             So we need to see what was occurring during that

20   period of time face to face with Patrick Green as well as other

21   inmates.  We also know --

22             **THE COURT:**  What's the request for?

23             **MR. PECKHAM:**  Sure.  It's, produce all documentation

24   regarding -- reflecting each observation, face to face or

25   otherwise, of each inmate in Pod 3C4, including Patrick Green,

43

1   performed by any guard, detention officer, healthcare

2   professional or other contractor or employee of Harris County

3   for that 25-day period, March 1st to March 25th.

4           **THE COURT:**  So they were -- you're looking for them

5   to have made a record of interaction with the -- with

6   Mr. Green?

7           **MR. PECKHAM:**  To the extent it exists.  We know

8   there's some pass-on reports which are effectively shift-change

9   reports --

10          **THE COURT:**  Okay.

11          **MS. COUNTISS:**  Which we produced -- we produced from

12  January to March --

13          **MS. HULSEY:**  April.

14          **MS. COUNTISS:**  I mean, to April of the year in

15  question, your Honor.  In addition, the issue we have with this

16  is mostly related to HIPAA because they're asking for

17  information about when -- what medical care or medical requests

18  or medical treatment other inmates received in the jail.  We

19  can't possibly release that without having addressed the

20  protective order issue that we brought up.

21          **THE COURT:**  All right.  But now that we have --

22          **MR. PECKHAM:**  Well, we have the protective order --

23          **THE COURT:**  -- can you produce it?

24          **MS. COUNTISS:**  From -- so we're talking about the --

25  well, we have produced the pass-on logs.

1          **THE COURT:**  Right.

2          **MS. COUNTISS:**  And so, yes.  So I suppose any other

3   responsive information that was waiting for HIPAA protection to

4   -- you know, it'll --

5          **THE COURT:**  They'll produce it?

6          **MS. COUNTISS:**  -- be produced.

7          **THE COURT:**  All right, okay.  Good.

8          **MR. PECKHAM:**  And if that's the answer to 42, I think

9   that encompasses 43 which asks for I-60s, other requests for

10  medical treatment by the inmates in 3C4 for a week period of

11  time, March 18th to March 25th.  It's a little bit of a

12  difference because before, we were looking for what the staff

13  saw and now we're asking what did the inmates report or

14  complain of or see.  So that's the I-60s or requests for

15  medical treatment for that period of time.

16         **MS. COUNTISS:**  I do --

17         **MR. PECKHAM:**  It's only one week.

18         **MS. COUNTISS:**  I do want to go back though.  There

19  have been a lot of statements made about things that the

20  Plaintiffs are claiming are facts and established facts in the

21  case that are absolutely not established yet and I just --

22         **THE COURT:**  Okay.  I understand you have different

23  perspectives on what the facts are.  I -- you know, this

24  happens in every case.

25         **MS. COUNTISS:**  Of course.  I just -- I've read the

1    transcripts he's referring to and they don't -- they don't

2    indicate much of the information he's claiming they do and I

3    just want to be clear.

4            **THE COURT:**  But you can produce those I-60s as well

5    under the protective order?

6            **MS. HULSEY:**  Well -- no, those are not retained and

7    we told them that.  Let's see.  First of all, an I-60 is a term

8    relating to prison -- Texas Department of Criminal Justice.

9    This is a jail but inmates sometimes refer to medical requests

10   as I-60s.  When an I-60 -- when an I-60 -- when a medical

11   request is received in Medical, the complaint is recorded on a

12   triage log and the request is not retained.  We've told them

13   that and we've been waiting on the protective order as far as

14   producing those logs.

15           **MR. PECKHAM:**  Then we're in great shape.

16           **MS. HULSEY:**  Yeah.

17           **MR. PECKHAM:**  We'll --

18           **MS. HULSEY:**  And this one, 43 wasn't even an issue, I

19   thought, after our telephone conversation.

20           **MR. PECKHAM:**  Oh, I'm sorry.  It's --

21           **MS. HULSEY:**  Your email said --

22           **MR. PECKHAM:**  -- under your response.

23           **MS. HULSEY:**  Well, your email said in one section --

24           **MR. PECKHAM:**  Sorry, we're talking to each other.

25           **THE COURT:**  That's okay.

1          **MS. HULSEY:**  So it's not at issue in another section.

2     It is in this one.  So --

3          **MR. PECKHAM:**  Okay.  We're clear.

4          **THE COURT:**  Okay.  So you probably worked out Number

5     42?

6          **MS. HULSEY:**  Forty-three.

7          **THE COURT:**  Forty-three?

8          **MS. HULSEY:**  Yeah.

9          **THE COURT:**  Okay.  All right.  Now, the thing about

10    the videotapes -- you're trying to negotiate a resolution of

11    that.  That's not one of the things that's disputed here?

12         **MS. COUNTISS:**  They're -- the dispute -- the answer

13    is, no, that's not disputed here because the request that we're

14    in dispute did not cover the videos that he described -- that

15    they described as the basis for believing they need an

16    inspection.

17         **THE COURT:**  Okay.  So the videotapes, were they

18    destroyed or not destroyed?

19         **MS. HULSEY:**  They were overwritten, if that's a

20    proper word.  There's videotaping in the jail and after a

21    certain period of time, the computer system overwrites itself.

22    The letter that the Plaintiffs refer to is a March 25th, 2015

23    Notice of Intent to Sue letter.  It is attached as Exhibit A to

24    the Plaintiffs' motion to compel, Document 16-1 at Pages 1

25    through 2 and in that letter, which was submitted to Harris

1   County within less than 24 hours after Patrick Green's death,

2   the Plaintiffs indicate that they're going to sue Harris County

3   and -- as a consequence of their son -- of Plaintiffs' son's

4   death and they asked Harris County to preserve documents,

5   videotapes and the like, you know, other things relating to

6   their claims and Harris County's defenses.

7           And, of course, Harris County had no idea what claims

8   Plaintiffs were referring to by this letter which, again, is at

9   Document 16-1 at Pages 1 through 2.

10          **MR. PECKHAM:**  And if you're -- if I may, your Honor?

11          **THE COURT:**  So then after you received that letter,

12   you're saying the videotape was over-recorded?

13          **MS. HULSEY:**  Overwritten and they're claiming, for

14   example, that the videotapes would have shown something and

15   it's our position that they -- that there aren't videotapes

16   that would have shown something.

17          **MS. COUNTISS:**  So there's not -- there's absolutely

18   no -- not going to be any video of the inmates in their cells.

19          **MR. PECKHAM:**  My question --

20          **MS. COUNTISS:**  That doesn't happen.

21          **MS. HULSEY:**  And there's no video that captures a

22   look at the grievance or at the medical request box.

23          **MS. COUNTISS:**  The medical request box.  They have

24   interviewed out of a long list of inmates and former inmates.

25   They have chosen two or three and I think maybe one of them

1 said, oh, yeah, yeah, yeah, there's a camera by the medical box

2 or whatever but that's not accurate.  There is not a recording

3 of where inmates put their requests to see a nurse.

4    There is no video that looks into the cell and

5 there's certainly no video in the clinic which would, you know,

6 be a HIPAA violation and so at best, there could potentially

7 have been something that would maybe have shown him taken to

8 the clinic, not from his cell because there's not video in the

9 cell.  There's -- there -- maybe at the elevator.  Right, there

10 may be a camera by the elevators.  In other words, he was taken

11 on a stretcher, went to the clinic, was in the clinic for an

12 hour or a little more where there's no video and then went to

13 the hospital in an ambulance to Ben Taub and passed away

14 shortly thereafter.

15 So --

16    **THE COURT:**  So it's all -- video, if it existed,

17 would have been in the hallways?

18    **MS. HULSEY:**  Right.

19    **MS. COUNTISS:**  Yes.

20    **MS. HULSEY:**  Right.

21    **MR. PECKHAM:**  That's right.

22    **THE COURT:**  Okay.  And that's what you wanted?

23    **MR. PECKHAM:**  Well, any video that's there and we

24 assume it is on the hallways.  We would not have expected that

25 videotape would have been on inmates on bunks in, you know, on

1   the toilet and that's not what we're looking for and I don't

2   think it exists or should exist.  I am sure there are Federal

3   rulings from other places saying you can't do that.

4        But it's interesting, your Honor, and I can put these

5   before the Court.  It's in the -- it's in -- attached to

6   Exhibit A, the letter -- may I, your Honor?

7        **THE COURT:**  Uh-huh, sure.

8        **MR. PECKHAM:**  That's the letter that was sent by

9   Mr. Hightower and I circled on the back on the next page --

10  typical legal-hold letter seeking videotapes.  And if I may

11  also, your Honor, a year later, this is a letter from Harris

12  County to the Attorney General not saying no tapes ever existed

13  but any tapes that would have existed have been destroyed --

14       **THE COURT:**  Okay.  So your --

15       **MR. PECKHAM:**  -- and so --

16       **THE COURT:**  -- discovery request is for the chain of

17  custody if they're been destroyed, right?

18       **MR. PECKHAM:**  That's right.  We don't know -- we --

19       **MS. HULSEY:**  No, that's --

20       **MR. PECKHAM:**  -- well, it is now and if the tapes

21  don't exist --

22       **MS. HULSEY:**  No.

23       **MR. PECKHAM:**  If I may, your Honor?  If the tapes

24  don't exist and they were destroyed, then certainly Harris

25  County knew we were seeking them.  They attached that letter to

1  every response and objection to providing evidence so -- to the

2  Texas Attorney General.  Over and over and over again they

3  would say, we're not going to produce it because there's a

4  threat of litigation.  Here's the letter that says it.  So they

5  know that letter exists.  They knew it existed.  They knew the

6  request for that information existed over and over and over

7  again.  So it's a real predicament.

8          So we don't know, your Honor, if Harris County or the

9  Sheriff's Department and the Harris County Attorney's office

10 has destroyed those tapes or if Harris County Attorney's office

11 ever had them or if they were given to the Harris County

12 District Attorney's office or whether they were given to the

13 Department of Justice or what our steps if some goofball

14 detention officer has them saved on his laptop computer.  But

15 we'll know that based upon a chain of custody as to where the

16 videos went and when they were destroyed, et cetera.  So if

17 they're not going to provide us the videotapes and they say

18 they've been destroyed, how, when, what, where, et cetera?

19         **THE COURT:**  So --

20         **MS. COUNTISS:**  Part of the -- again, part of the

21 confusion is that the request he's discussing were public

22 information requests, not discovery requests to us in

23 litigation.

24         **THE COURT:**  Okay.  Make a discovery request or if you

25 agree to produce it in discovery without a request, I mean --

1          **MR. PECKHAM:**  Okay.  We will make that today.

2          **THE COURT:**  -- one or the other.

3          **MS. COUNTISS:**  And there is no dispute that the

4    letter -- we're not disputing that this -- that we received any

5    of these letters --

6          **THE COURT:**  Okay.

7          **MS. COUNTISS:**  -- and, you know, furthermore, there

8    are retention document -- retention policies that have been

9    produced or will be produced -- that have been produced that

10   will explain the chain -- what he's talking about as far as,

11   you know, how any video if it existed and would have been

12   relevant at all would have been on a deletion-overwrite

13   schedule.

14         **MR. PECKHAM:**  And, of course, under the new rules, we

15   know that although relevance is always important, Judge, we're

16   dealing with proportionality and certainly we have a right to

17   know whether they existed and we have a right to look at them

18   and see whether there's relevant information on them.

19         **THE COURT:**  I agree.  Okay.  I'll make an order and

20   give me the protective orders as you can and if you have to

21   make another discovery request, do it right away --

22         **MR. PECKHAM:**  We'll do that today.

23         **THE COURT:**  -- in regard to these chain of custody

24   matters unless you can negotiate an agreement.  You know,

25   sometimes discovery is done that, too.

1          **MS. COUNTISS:**  We did respond to one interrogatory

2    that addressed that area.  So I'm not sure why that wasn't

3    satisfactory for them.

4          Do you have anything?

5          **MR. PECKHAM:**  I'm having people whisper.

6          The request I think we would have, we sent out the

7    interrogatory for a chain of custody if we can get somewhat an

8    expedited response.  They've had close to two years now with

9    this information.  There have been multiple, multiple requests

10   for --

11         **THE COURT:**  I think they've tried to explain it here

12   in court.  I don't think they have a problem explaining the

13   chain of custody and answering your, you know, new

14   interrogatory.  So, I mean, I don't imagine it would take more

15   than 20 days or so.

16         What do you think?

17         **MS. HULSEY:**  Well, we have to --

18         **MS. COUNTISS:**  It depends what it says.

19         **MS. HULSEY:**  -- we have to find out who would have

20   the information and that sort of thing but we'd like our

21   regular time --

22         **THE COURT:**  Which is how much?

23         **MS. HULSEY:**  Thirty days.

24         **THE COURT:**  Okay.  Can you do it in 20 days?

25         **MS. COUNTISS:**  If you prefer, sure.

53

1          **THE COURT:**  They have a statute of limitations, you

2     know, kind of looming --

3          **MS. COUNTISS:**  Sure.

4          **THE COURT:**  -- and that's why I'm asking for you to

5     answer that interrogatory about the chain of custody, if the

6     videotapes that they haven't propounded yet but they're going

7     to craft one for you.

8          **MR. PECKHAM:**  Good enough.

9          **MS. COUNTISS:**  Go ahead.

10         **THE COURT:**  Can you answer it in 20 days?

11         **MS. HULSEY:**  We'll do our best.

12         **MS. COUNTISS:**  Yes.

13         **THE COURT:**  Thank you.  All right.

14         **MR. PECKHAM:**  Thank you, your Honor.

15         **MR. KALLINEN:**  Jail inspection.

16         **THE COURT:**  Anything else?

17         **MR. PECKHAM:**  Oh, jail inspection.

18         **THE COURT:**  A jail inspection, you -- I thought you

19     were negotiating that.

20         **MS. COUNTISS:**  No.  Your Honor, there's --

21         **THE COURT:**  Okay.

22         **MS. COUNTISS:**  -- nothing about them coming into the

23     jail with two or three, as they've told us, unidentified

24     experts videoing and taking pictures and taking measurements

25     that can't -- number one, can't be obtained in many other

54

1    possible ways.

2              **THE COURT:**  Like what?

3              **MS. COUNTISS:**  Like in discovery requests asking for

4    measure -- they're talking about doing measurements of hallways

5    and measurements of distances from the cell to the -- to where

6    some of the guards might have been.

7              **THE COURT:**  What request is it?  Did you make a

8    specific discovery request for an inspection?

9              **MS. COUNTISS:**  No.

10             **MR. PECKHAM:**  Judge, and --

11             **MS. COUNTISS:**  Oh, for the inspection, yes.

12             **MR. PECKHAM:**  I think it was -- I want to say Number

13   1.  Yes, it was Number 1.

14             **THE COURT:**  Number 1 of what?

15             **MR. PECKHAM:**  Oh, sorry, the --

16             **MR. KALLINEN:**  Request --

17             **MR. PECKHAM:**  Yeah, request --

18             **MS. COUNTISS:**  It's inspection and request for

19   production.

20             **MR. PECKHAM:**  That's correct.

21             **THE COURT:**  Inspection and request for production?

22             **MR. PECKHAM:**  That's correct.  It's Request for

23   Production Number 1 but it was titled, "Request for Inspection

24   1."

25             **MS. COUNTISS:**  Yeah.

1          **MS. HULSEY:**  And we responded at Document Number 25

2    at Electronic Pages 26 through 33.

3          **MR. PECKHAM:**  And, your Honor, I've never seen an

4    expert who can get -- who is not going to be cross examined

5    over -- ah, he never went to the jail, did you?  You can't --

6    you don't know this for a fact, do you?  You never saw that?

7          And clearly, those lines of sight are going to be

8    extremely important and I appreciate Harris County's offer to

9    do all the measurements for us but there is no substitute for

10   an expert going in and saying, oh, well, I see this.  That

11   brings up another line of sight we didn't look at.

12         **THE COURT:**  Did you identify the expert?

13         **MR. PECKHAM:**  We have not and we will certainly as

14   part of the protocol.

15         **MS. COUNTISS:**  Your Honor, they also are asking to

16   take pictures and unspecified videos and they indicated it has

17   to do with showing conditions in the jail which obviously are

18   not going to be the same now as they were in March of 2015, for

19   one and for another, if sight lines -- I mean, sight lines is

20   what they're most concerned about.  It -- I don't -- it's hard

21   to see how that requires entering a secured premises full of

22   inmates to find out whether the guards that have been

23   identified in disclosures -- what they saw or whether they saw

24   anything or what the -- you know, what they observed just

25   because there's a distance between a window and a cell which

1    could be given to them doesn't -- I mean, I don't see -- I

2    don't even remotely see how that outweighs the burden on what

3    -- you know, all these folks coming in and --

4           **THE COURT:**  The problem is that they're required to

5    take your word for anything, you know.  You have your version

6    of the facts and they have theirs.  So --

7           **MS. COUNTISS:**  So -- but -- so what happens when they

8    get in there?

9           **THE COURT:**  I think that they should be allowed to

10   inspect it.  You know, if you want control over that, then

11   negotiate a protocol.  I'll give you some time to do that and

12   then I'll enter an order.  So you can negotiate a protocol.

13   You need to identify who's going in there though.

14          **MR. PECKHAM:**  Will do.

15          **THE COURT:**  And today's the 10th.  Okay, I would

16   think it ought to be done by the end of this month, the

17   inspection, you know -- or maybe that's pushing it a little bit

18   but at least the protocol.  You should negotiate that by the

19   27th and then, you know, I'll step in if I need to.

20          **MR. PECKHAM:**  That makes sense for us, your Honor.  I

21   mean, obviously if -- you know, if an hour is in dispute or two

22   hours are in dispute or if it's a Sunday morning when there's

23   low -- well, I guess that would be high -- that a -- you know,

24   we'll certainly --

25          **THE COURT:**  Well, work out as much as you can.

1          All right.  Good luck with your case.

2          **MR. PECKHAM:**  Thank you, your Honor.

3          **MR. KALLINEN:**  Thank you, your Honor.

4          **THE COURT:**  You're excused.

5      **(This proceeding adjourned at 11:21 a.m.)**

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

CERTIFICATION


I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.




_____                    _January 13, 2017_


                    TONI HUDSON, TRANSCRIBER