UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

KATHRYN GREEN, *et al*,　　　　§
　　　　　　　　　　　　　　　§
　　　　Plaintiffs,　　　　　　§
VS.　　　　　　　　　　　　　§　　CIVIL ACTION NO. H-16-893
　　　　　　　　　　　　　　　§
HARRIS COUNTY, TEXAS, *et al*,　§
　　　　　　　　　　　　　　　§
　　　　Defendants.　　　　　　§

## MEMORANDUM AND ORDER

Pending are Harris County's Motion for Summary Judgment (Doc. No. 296); Defendant Michael James Malloy's Motion for Summary Judgment (Doc. No. 299); Plaintiff's Motion on Spoliation After Jail Inspection (Doc. No. 291); Harris County's Motion regarding Jail Inspection (Doc. No. 292); Defendants' Joint Motions to Exclude Testimony of Plaintiffs' Expert Roger Clark (Doc. No. 294) and to Exclude Portions of Dr. Gregory Moran's Testimony (Doc. No. 301); Plaintiffs' Motion to Strike Reports of Experts as Hearsay (Doc. No. 308); Plaintiffs' Motions to Strike Affidavits of Bryan Pair, Laxman Sunder, and Patrick Dougherty (Doc. Nos. 305, 306, 307); and Plaintiffs' Motion for Leave to File a Response to Objections to MSJ Evidence (Doc. No. 326). The Court has carefully considered all of the motions, responses, replies, evidence in the record, and applicable law, and concludes as follows.

## I.　BACKGROUND

The allegations in the Plaintiffs' Second Amended Complaint were set forth in the background facts of the Court's Memorandum and Order dated August 13, 2018 and need not be repeated at length here. *See* Doc. No. 245. The relevant facts supported by competent summary judgment evidence are set forth below.

From the date of his arrest on December 31, 2014 until the day he died on March 24, 2015, Patrick Green ("Patrick") was confined in the Harris County Jail ("Jail").[1] On March 5, 2015, he entered a plea of guilty to a drug charge and was sentenced to two years in the Texas Department of Criminal Justice ("TDCJ").[2] At the time of his death, he was awaiting transport to state prison to serve his sentence for the drug conviction and hoped to be released on some form of parole shortly after arriving at TDCJ.[3]

Patrick was a "trustee," a low-security-risk inmate who was eligible to have a job in the Jail, and never caused trouble for the Harris County guards or staff.[4] Patrick was housed in the 3C4 dormitory-type cell along with approximately 25 other inmates.[5] Pod C on Level 3 at the Jail consists of four such dormitory-type cells with a Pod Control Center ("PCC" or "picket") in the center of the four cells.[6] The picket has four large windows through which the picket officer on duty may observe the inmates in each of the four dormitory cells.[7] The picket officer must remain in the picket unless another officer comes to relieve that officer because there must be a

---

[1] Internal Affairs Division ("IAD") Report, Doc. No. 297-1 at 29-30 (under seal). Unless otherwise identified by BATES stamp number or transcript page, citations to the record reflect the pagination stamped by the CM/ECF system.

[2] *Id.*

[3] *Id. See also* Custodial Death Report, Doc. No. 310-19 at 2, BATES HC/GREEN 7886 (under seal). Patrick's telephone conversations in the week before he died reflect that he was awaiting transfer to TDCJ and weighing his options regarding parole or release to relatives. *See, e.g.*, Telephone Transcripts, Doc. No. 297-6 at 33-34, 53-60, 72-73, 89, 170-172, 179-180 (under seal).

[4] *See, e.g.*, IAD Report, Doc. No. 297-1 at 16, 17.

[5] "3C4" means Level 3, Pod C, and cell number 4 at the Jail.

[6] *See* Doc. No. 292-6 (schematic diagram of Level 3, Pod C) (under seal).

[7] *See* Doc. No. 292 at 5 (photograph of the picket from the hallway outside 3C4 showing the window through which a picket officer may observe inmates in 3C4) (under seal); Doc. No. 292-3 (screen shot photograph of picket from the hallway at 3C4 from the security camera) (under seal); Doc. No. 291-2 at 2-8 (view from the hallway into 3C4 through the window) (under seal); Doc. No. 300-1 at 1-2 (view into 3C4 cell from the window) (under seal); *see also* Clark Depo., Doc. No. 310-26, at transcript page 138:2-9 (all areas of the cell are visible to the officer in the picket through the window).

guard in the picket at all times.[8] Harris County requires PCC personnel to conduct observations of the inmates every thirty minutes and to record those observations on a "pass on" log.[9] The guard on duty is also required to enter each cell three times per shift.[10]

On March 24, 2015, Defendant Officer Michael James Malloy ("Malloy") began his eight-hour shift at 2:00 p.m. as the sole picket officer for the 3C pod of four cells, including Patrick's 3C4 cell.[11] All of the inmates assigned to Patrick's 3C4 cell worked in the Laundry Room, and their shift that day began shortly after Malloy started his shift in the picket.[12] Sometime between 2:00 p.m. and 2:30 p.m., before the group went to work, Malloy conducted the count[13] while another officer relieved him in the picket.[14] At that time, Patrick approached Malloy and asked to be allowed to stay in from work because he was not feeling well.[15] Malloy gave him permission to stay back from work.[16]

Malloy then overheard Patrick tell another inmate that he had been throwing up.[17] Patrick did not ask Malloy if he could go to the medical clinic that afternoon, and Malloy did not ask him if he needed to go to the clinic or question him further about his medical condition.[18]

---

[8] See Pod Control Center ("PCC") Policy, Doc. No. 296-46 at 3, BATES HC/Green 8406 (*"At no time, will PCC personnel leave the Pod Control Center (PCC) unmanned."*) (emphasis in original); Malloy Aff., Doc. No. 296-17 at 3.

[9] See "Inmate Observation" Policy #CJC-220, Doc. No. 296-5 at 2.

[10] *Id.* at 3.

[11] Malloy Aff., Doc. No. 296-17 at 1, 3.

[12] *Id.* at 3; Malloy IAD Transcript, Doc. No. 310-6 at 7:1-22 (under seal).

[13] Malloy Depo., Doc. No. 310-1, transcript at 68:14-18. Harris County policy requires a staff person to conduct the count near the beginning of each shift (*i.e.*, three times each day) in order "to verify all inmates are accurately accounted for." Doc. No. 296-8 at 1; *see also* Doc. No. 296-5 at 2. During count, a staff member enters the cellblock to conduct count and to take "the opportunity to evaluate the inmate's health and physical well being." Doc. No. 296-8 at 3.

[14] Malloy Aff., Doc. No. 296-17 at 2.

[15] *Id.*

[16] *Id.*

[17] *Id.*

[18] *Id.*; Malloy IAD Transcript, 310-6 at 8:25-9:12 (under seal).

Malloy averred that at that time, nothing indicated to him that Patrick had an immediate medical need.[19]

All of the inmates in 3C4 pod went to work that afternoon except Patrick, who remained resting in his bunk.[20] Around 4:30 p.m., an inmate worker delivered dinner trays to the 3C4 pod.[21] Malloy overheard Patrick tell the worker delivering dinner trays that he did not want his tray but that he was "okay."[22]

After his cellmates returned from work, Patrick got up from his bunk to get a drink of water and use the toilet.[23] When he passed Inmate Raymond Eisenbach's bunk, he fell, and Eisenbach and other inmates helped him back up.[24] When Patrick came back from the bathroom, he stumbled as he walked and started to fall down a second time.[25] Alarmed, Patrick's cellmates grabbed him as he stumbled and helped him get back in his bunk.[26] At that point, they noticed that he was very pale and pressed the button to alert Malloy in the picket that Patrick needed medical help.[27] Malloy called for help right away.[28]

---

[19] Malloy Aff., Doc. No. 296-17 at 2; Malloy IAD Transcript, Doc. No. 310-6 at 9:15-10:7 (under seal).

[20] Malloy Aff., Doc. No. 296-17 at 2; Malloy IAD Transcript, Doc. No. 310-6 at 11:3-6 (under seal).

[21] Malloy Aff., Doc. No. 296-17 at 2.

[22] *Id.*; Malloy Depo., Doc. No. 310-1, transcript at 124:25-125:1, 163:13-20.

[23] *See, e.g.*, Griggs IAD Statement, Doc. No. 297-1 at 18; Broussard IAD Statement, Doc. No. 297-1 at 16; Taylor IAD Statement, Doc. No. 297-1 at 20. The witnesses vary in their time estimates regarding when the inmates returned from work, ranging from as early as 3:00 p.m. (with a laundry shift start time of 11:00 a.m.) to 7:00 p.m. Plaintiffs do not dispute that the laundry shift started sometime after 2:00 p.m.

[24] Eisenbach IAD Transcript, Doc. No. 310-17 at 10:24-11:14, BATES GREEN 004578-79 (under seal).

[25] *Id.* at 11:6-10.

[26] *Id.*

[27] *Id.* at 11:11-19.

[28] Eisenbach IAD Transcript, Doc. No. 310-17 at 4:13-25 (explaining that he "told Malloy twice, and he called right then each time"); Malloy IAD Transcript, Doc. No. 310-6 at 18:17-19:25; Turner IAD Statement, Doc. No. 297-1 at 22; Enriquez IAD Statement, Doc. No. 297-1 at 23.

Detention Officer Warner Dean Ervin ("Ervin")[29] responded to Malloy's requests for a "rover," or guard who walks the hallways in the Jail.[30] Ervin entered 3C4 cell and checked on Patrick, who was lying face up in his bunk at that time.[31] Ervin asked Patrick to get up to go to the clinic, but Patrick indicated that he was too weak and did not think he could walk there.[32] Ervin then left the cell and went to get Detention Officer Barrow for assistance and told Malloy to call the clinic for a wheelchair.[33] Malloy called the clinic to send up a wheelchair and called the Floor Control Center to notify them that medical was on the way up to 3C4 so that an officer could make sure elevators were available and doors were open so medical staff could make it to the cell easily.[34]

When Ervin and Barrow returned to the pod, Patrick was facing the wall and was making growling or snoring sounds.[35] Ervin used his boot to kick or shake Patrick and get his attention, but Patrick was not responding.[36] Nurse Williamson-Johnson arrived at the cell around this time with a wheelchair.[37] Williamson-Johnson approached Patrick's bunk with the officers and asked

[29] Ervin became a Detention Sergeant on July 17, 2018. *See* Ervin Depo., Doc. No. 312-12 at 5:16-18.

[30] Ervin IAD Statement, Doc. No. 297-1 at 26.

[31] *Id.*

[32] *Id. See also* Broussard IAD Statement, Doc. No. 297-1 at 16-17 (stating that when Ervin came in to the cell he confiscated an orange from under Patrick's bed and asked Patrick some questions, to which Patrick responded, "F*** you" to Ervin and said he was all right).

[33] Eisenbach IAD Transcript, Doc. No. 310-17 at 6:18-7:3; Ervin IAD Statement, Doc. No. 299-21 at 2; Ervin Depo., Doc. No. 312-12, transcript at 19:5-6.

[34] Malloy Aff., Doc. No. 296-17 at 3. Ervin IAD Statement, Doc. No. 297-1 at 26; Williamson-Johnson Depo., Doc. Nos. 299-23/310-11, transcript at 70:2-8.

[35] Ervin IAD Statement, Doc. No. 297-1 at 26. The time estimates on how long it took for Ervin to come to the cell vary from within a few minutes to up to between 30-45 minutes, and it is unclear whether those time estimates refer to the first time Ervin came to the cell or include the second time he came in with Barrow. *See* Fountain IAD Statement, Doc. No. 310-2 at 1; Barber IAD Statement, Doc. No. 297-1 at 13; Johnson IAD Statement, Doc. No. 297-1 at 13-14; Ennett IAD Statement, Doc. No. 297-1 at 15; Broussard IAD Statement, Doc. No. 297-1 at 16; Derrick IAD Statement, Doc. No. 297-1 at 17; Griggs IAD Statement, Doc. No. 301-2 at 3-4; Vasquez IAD Statement, Doc. No. 297-1 at 20-21; Turner IAD Statement, Doc. No. 297-1 at 22; Eisenbach Statement, Doc. No. 310-18, transcript at 34:25-35:1.

[36] Eisenbach IAD Transcript, Doc. No. 310-17 at 7:2-4, 8:14-18; Ervin IAD Statement, Doc. No. 297-1 at 26.

[37] Williamson-Johnson Depo., Doc. Nos. 299-23/310-11, transcript at 70:6-8.

Patrick what was going on, but by that time Patrick was not responding in clear speech.[38] Williamson-Johnson noticed that Patrick appeared to be very sick and determined that it would not be safe to transport Patrick in the wheelchair.[39] She notified Malloy to call the clinic to send a stretcher up, which he did.[40] Williamson-Johnson stated that it was a medical emergency at that point.[41]

After the stretcher arrived in the pod, detention officers took Patrick to the clinic at the Jail for triage with a team of medical personnel.[42] Williamson-Johnson opened up the medical file at the clinic at 8:11 p.m. after Patrick arrived there on the stretcher.[43] The medical records reflect that Patrick was unresponsive and had a temperature of 99.9 at that time.[44] Dr. Lu evaluated him and called for an ambulance to transport him to Ben Taub Hospital, and the ambulance was dispatched at 8:33 p.m.[45] The ambulance personnel arrived at the clinic at 8:39 p.m., saw Patrick at 8:44 p.m., left the clinic at 9:09 p.m., and arrived at Ben Taub Hospital with Patrick at 9:14 p.m.[46] On arrival at the Emergency Room, his temperature was 100.8;[47] by 10:02 p.m., he had a fever of 101.9.[48] Medical personnel intubated Patrick and started him on broad spectrum antibiotics and fluids.[49] Despite these efforts, he went into cardiac arrest at 11:10 p.m.

---

[38] Ervin IAD Statement, Doc. No. 297-1 at 26, Doc. No. 297-1 at 26; Williamson-Johnson Depo., Doc. Nos. 299-23/310-11, transcript at 72:106.

[39] Williamson-Johnson Depo., Doc. Nos. 299-23/310-11, transcript at 72:1-11.

[40] Id., transcript at 72:10-11, 72:16-18.

[41] Id., transcript at 76:1.

[42] Id. at 12:14-25; see also Ervin IAD Statement, Doc. No. 297-1 at 26.

[43] Williamson-Johnson Depo., Doc. No. 299-23, transcript at 76:25-77:1; Doc. No. 310-11, transcript at 84:3-15.

[44] Harris County Medical Records, Doc. No. 300-2 at 28, BATES Green 00415 (under seal).

[45] Id. at 32, BATES Green 000419; EMS Records, Doc. No. 300-4 at 1 (under seal); EMS Records, Doc. No. 310-21 at 2 (under seal); Williamson-Johnson Depo., Doc. No. 310-11, transcript at 110:22-25 (stating that Dr. Lu gave the report to the paramedics about Patrick's condition when they came to transport him to Ben Taub).

[46] EMS Records, Doc. No. 300-4 at 1 (under seal), Doc. No. 310-21 at 2 (under seal).

[47] EMS Transport Narrative, Doc. No. 310-21 at 2 (under seal).

[48] Ben Taub Medical Records, Doc. No. 300-5 at 11 (under seal).

[49] Id. at 12.

and died at 11:59 p.m.[50]  At that time, doctors at Ben Taub had a broad differential diagnosis of possible causes of Patrick's illness: ingestion of a toxin, drug reaction, meningitis, encephalitis, encephalopathy, sepsis/bacteremia, trauma, or some neurological issue.[51]

An autopsy later revealed that Patrick died of acute bacterial meningitis, caused by *streptococcus sanguinis*, a common bacteria found in the mouth but an extremely uncommon cause of meningitis.[52]  How Patrick developed this non-contagious, rare form of meningitis from his mouth bacteria, how it traveled to his brain, and how long he had the infection before he died are not known with medical certainty.[53]

Plaintiffs Kathryn Green as representative of the Estate of Patrick Green, Kathryn and David Green, Patrick's parents, (collectively, "Plaintiffs") sued Harris County and numerous guards and medical personnel in the wake of Patrick's tragic death.  On September 26, 2018, the Court dismissed all of the defendants except Malloy, Ervin, and Harris County.  (Doc. No. 253). On March 6, 2019, the Court granted Plaintiffs' unopposed motion to dismiss Ervin and the claims regarding sanitation and hygiene in the Jail.  (Doc. No. 302).

Malloy and Harris County, the remaining defendants, move for summary judgment. Malloy contends that he was not deliberately indifferent to Patrick's medical needs and invokes his entitlement to qualified immunity.  (Doc. No. 299).  Harris County argues that Plaintiffs do not raise a fact issue that there was a constitutional violation, or that a Harris County policy or

---

[50] *Id.* at 15-16.

[51] *Id.* at 9.

[52] *See* Autopsy Report, Doc. No. 310-22 (under seal); Hamill Report, Doc. No. 296-24 at 1-10; Moran Depo., Doc. No. 301-1, at transcript 37:5-7, 58:12-14, 62:4-5; Ly Report, Doc. No. 296-25 at 13 ¶ 24.

[53] Plaintiffs' medical expert testified that poor oral hygiene could have played some role in Patrick's illness, because *streptococcus sanguinis* is common in the mouth. *See* Moran Depo., Doc. No. 301-1, transcript at 136:13-17.  The medical experts opine that the bacteria could have traveled to his brain through a sinus infection, or a laceration in his mouth, or through some respiratory infection, and that the bacteria most likely traveled through his blood. *Id.*, transcript at 135:6-22; *accord* Hamill Report, Doc. No. 296-24 at 6-8; Ly Report, Doc. No. 296-25 at 13 ¶ 24.

practice was the moving force of any constitutional violation. (Doc. No. 296). The parties have also filed several evidentiary motions, which the Court considers in turn below.

## II.     EVIDENTIARY MATTERS

### A.     Plaintiffs' Spoliation Motion for Failure to Preserve Video

On March 25, 2015, the day after Patrick died, Plaintiffs sent a letter to the Harris County Attorney's Office entitled "Notice of Claim and Demand for Preservation of Evidence." (Doc. No. 251 at 5). Among other things, Plaintiffs requested that Harris County "preserve and maintain all evidence pertaining to any claim or defense related to this incident . . . including statements, photographs, videotapes, audiotapes, surveillance or security tapes or information . . . related to the referenced incident or damages." *Id.* at 6. Although it appears that Harris County did preserve voluminous written records regarding Patrick's death in custody, including its investigative files and audio files of Patrick's telephone calls,[54] Harris County did not preserve any video surveillance footage in the Jail for the days preceding Patrick's death.

Plaintiffs moved for sanctions, arguing that the video evidence that has been destroyed was the "best evidence" for their claims against Harris County. (Doc. No. 250). On November 14, 2018, the Court denied the motion without prejudice to the parties filing supplemental motions after completing a jail inspection, because the placement of the cameras would elucidate whether any relevant video ever existed. (Doc. No. 260). The parties conducted the jail inspection on January 22, 2019, which showed the following: (1) Patrick's living area is not covered by a camera;[55] (2) the path from 3C4 to the medical box is not covered by a camera;[56]

---

[54] *See* IAD Report, Doc. No. 297-1 at 29 (detailing the search and preservation of audio records of phone calls made by Patrick Green, SPN 02712758).

[55] Clark Supp. Report, Doc. No. 285 at 3; Clark Depo., Doc. No. 292-1, transcript at 304:3-7.

[56] Clark Depo., Doc. No. 292-1, transcript at 301:23-302:4.

(3) the camera in 3C would not have recorded Malloy walking into and doing visuals of 3C4;[57] and (4) the picket, hallways, loading dock, and elevators have some camera coverage.[58]

Plaintiffs initially contended that video of Patrick in his cell would help to show what happened, but the jail inspection confirmed that the video cameras were not aimed to record inside the actual cells where the inmates slept (and where Patrick remained for the afternoon of March 24, 2015 until he was taken to the clinic on a stretcher).[59] Even so, Plaintiffs still contend that Harris County should have known to preserve any video that could possibly have contained video of Patrick or guard movement in the 3C pod, including hallway, elevator, and loading dock video footage. Harris County counters that it concluded that it did not have video responsive to the initial March 2015 preservation letter because the letter did not request video of the hallways, elevators, and loading dock, and because there was no camera that recorded any events inside Patrick's cell or at the clinic.

Plaintiffs allege that video of the picket, where Malloy sat, would have shown whether he conducted the twice-hourly observations of Patrick as reflected in his logs. Plaintiffs posit that video of the hallways and picket would have captured, *inter alia*, the following: (1) guards' "reactions" to what they were seeing and whether they walked down the hallway to conduct observations; (2) Patrick walking down the hallway, if he did so within view of the camera; (3) possibly whether Patrick placed anything in the medical box in the hallway; and (4) Patrick being transported to the clinic. They contend that footage of Patrick walking down a hallway

[57] *See id.*, transcript at 306:7-8 (testimony of Roger Clark, Plaintiffs' expert, that the camera in 3C4 "would never record Malloy walking into and doing the visuals of C4").

[58] Clark Supp. Report, Doc. No. 285 at 3; *see also* Moreno Depo., Doc. No. 251-8 at 42:5-9 (stating that there are only cameras looking into the picket not out of the picket) (under seal); *Id.* at 57:4-22 (no cameras inside the laundry room, or outside the laundry area in the hallway by the elevator); *id.* at 92:1-3, 6-21 (*no cameras inside or outside the clinic at 701 San Jacinto Street, just ones outside the holding cells in the hallway*); *id.* at 97:16-18 (there is a camera on loading dock).

[59] Clark Supp. Report, Doc. No. 285 at 3; Clark Depo., Doc. No. 292-1, transcript at 304:3-7.

could have shown his gait and possible signs of sickness. They argue that time stamps on video showing Ervin arriving at Patrick's cell and Patrick being taken to the clinic would elucidate a timeline of events.

A party seeking sanctions based on spoliation of evidence must establish that: (1) the party with control over the evidence had an obligation to preserve it at the time it was destroyed; (2) the evidence was destroyed with a culpable state of mind; and (3) the destroyed evidence was "relevant" to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense. *Rimkus Consulting Grp., Inc. v. Cammarata,* 688 F. Supp. 2d 598, 615-16 (S.D. Tex. 2010). "A party's duty to preserve evidence comes into being when the party has notice that the evidence is relevant to the litigation or should have known that the evidence may be relevant." *Guzman v. Jones,* 804 F.3d 707, 713 (5th Cir. 2015).

In the Fifth Circuit, sanctions for failing to preserve evidence are not proper unless there is a showing that the spoliated evidence would have been relevant. *Rimkus Consulting Grp., Inc.,* 688 F. Supp. 2d at 615-16 (citing *Condrey v. SunTrust Bank of Ga.,* 431 F.3d 191, 203 & n. 8 (5th Cir. 2005)). A showing of bad faith is also required. *See Condrey,* 431 F.3d at 203; *King v. Ill. Cent. R.R.,* 337 F.3d 550, 556 (5th Cir. 2003); *United States v. Wise,* 221 F.3d 140, 156 (5th Cir. 2000) (holding that "'[m]ere negligence is not enough' to warrant an instruction on spoliation"); *Russell v. Univ. of Tex. of Permian Basin,* 234 F. App'x 195, 208 (5th Cir. 2007) (unpublished op.) (quoting *Vick v. Tex. Employment Comm'n,* 514 F.2d 734, 737 (5th Cir. 1975)). Federal law governs whether the district court abuses its discretion in denying sanctions based on spoliation. *King,* 337 F.3d at 556.

First, Plaintiffs do not establish a duty to preserve the video in this case. Regarding video inside Patrick's cell or in the clinic, or Malloy's or Ervin's entering 3C4,[60] there were no cameras aimed to record those events, so any claim that Harris County did not preserve that non-existent video fails. *See, e.g., Bertrand v. Fischer*, No. 09-0076, 2011 WL 6254091, at \*4 (W.D. La. Dec. 14, 2011) (holding that there was no duty to preserve, and therefore no spoliation, where the defendant store produced evidence that there was no surveillance video of the aisle in question where the plaintiff fell); *Dixon v. Greyhound Lines, Inc.*, 2014 WL 6087226, at \*3 (M.D. La. Nov. 13, 2014) (no duty to preserve arises for evidence that was never created and never existed). Because video footage of Patrick in his cell and at the clinic did not exist, it was objectively reasonable for officials reading and applying the preservation letter to conclude that there was no video footage responsive to the request.[61]

Regarding the hallway, elevator, and loading dock video for the days preceding Patrick's death, the generic March 25, 2015 preservation letter did not place Harris County officials on notice to preserve such video in case his movements might have been captured incidentally on that video or that their request would include the days preceding his death. As Harris County points out, Patrick did not die in the Jail, and his death was not the result of a use of force or

---

[60] *See* Clark Depo., Doc. No. 292-1, transcript at 306:7-8 (testifying that the camera in 3C "would never record Malloy walking into and doing the visuals of C4").

[61] Plaintiffs rely on *Jenkins v. Woody*, 2017 WL 362475, at \*2 (E.D. Va. 2017), and *Ashton v. Knight Transportation*, 772 F. Supp.2d 772, 802-03 (N.D. Tex. 2011), for support of their claim for sanctions. Unlike *Jenkins*, where there was video footage of the pre-trial detainee in her cell, there was no video of Patrick in his cell to show what transpired during the afternoon of March 24, 2015 and no admission, as in *Jenkins*, that the video was relevant and the "best evidence" of what happened. 2017 WL 362475, at \*2. In *Ashton*, the trucking company employee fled the scene of the accident, promptly changed the tires in another state, and deliberately deleted all of the company email-type communications between the trucking company and the driver for the evening in question. 772 F. Supp.2d at 802-03. In contrast to *Ashton*, there is no indication that Harris County purposely destroyed adverse evidence to try to evade liability; Harris County promptly investigated Patrick's death and produced voluminous records of what transpired that evening. As discussed above, because there was no video footage inside Patrick's cell, it was objectively reasonable to conclude that there was no video responsive to Plaintiffs' initial, March 2015 request.

suicide.  He died in the hospital from an acute bacterial infection, not because of some affirmative use of force or violent action that might have been captured on videotape.  Unlike the situation in the "Vincent Young investigation" relied on by Plaintiffs, Patrick was not in a special cell undergoing close observation for suicide watch such that the hallway movements and observations of the guards would be pertinent to an investigation or a possible claim in a lawsuit.[62]

Captain Ronny Taylor testified that "[t]he jail does not preserve surveillance footage in the normal course of business unless someone is aware of a particular event, at a particular time, in front of a particular camera, and makes a specific request for that footage."[63]  He also stated that he "did not interpret this letter as requiring [Harris County] to preserve any particular video."[64]  He testified that he interpreted the March 2015 letter to request footage of the cell in which Patrick was housed and that it did not occur to him to go look for hallway videos or things of that nature.[65]

While the March 25, 2015 letter may have placed Harris County on notice to preserve video inside Patrick's dorm-like cell on the day he died, if such video ever existed, the letter did not place Harris County on sufficient notice to preserve ancillary video—that would have only incidentally recorded Patrick, if at all—from the hallways, elevators, and loading dock for the

---

[62] This case bears no resemblance to the Vincent Young case.  Unlike Patrick, Mr. Young was on suicide watch, requiring close observation in a special holding cell.  While officers had to approach Young's holding cell to peer in the small window to see him frequently, Patrick could easily be viewed at all times through the picket window.  Further, Young died in the Jail, whereas Patrick died of natural causes in the hospital.  In Patrick's case, there was no incident involving a violent death at the Jail that could possibly alert Jail officials that hallway, elevator, and loading dock videos could be relevant.  Further, as Defendants point out, the documents Plaintiffs submit regarding the Young investigation are inadmissible hearsay, and, accordingly, Defendants' objection to evidence from the Vincent Young investigation is SUSTAINED.

[63] Taylor Aff., Doc. No. 100-1 at 1.

[64] Id. at 2.

[65] Taylor Depo., Doc. No. 251-1, transcript at 151:8-10.

week preceding Patrick's death. Therefore, Plaintiffs do not meet their burden to show that Harris County had the duty to preserve the video of the hallways, loading dock, and elevators.

Second, Plaintiffs do not show bad faith. Even if Harris County had a duty to preserve the specific hallway, elevator, and loading dock videos as Plaintiffs contend, Plaintiffs do not establish that Harris County's failure to preserve that video was done in bad faith rather than negligence or oversight. "Bad faith, in the context of spoliation, generally means destruction for the purpose of hiding adverse evidence." *Guzman*, 804 F.3d at 713 (finding that defendants did not show bad faith where the plaintiff had surgery that had the effect of masking his injury and arguably "altered evidence" in a personal injury case). Plaintiffs do not show that Harris County's destruction of video footage from March 2015, which occurred as an automatic deletion after a period of time pursuant to the video retention policy, was for the purpose of hiding adverse evidence. Accordingly, the Court finds that Plaintiffs do not show bad faith.

Finally, Plaintiffs do not show that the video in question would have yielded relevant evidence to support their case. Harris County does not dispute that it transported Patrick, who was unresponsive at the time, through the hallway to the elevator in a stretcher on March 24, 2015, arriving at approximately 8:10 p.m. to the clinic, and EMS and medical records confirm the timeline of the arrival of the ambulance at the clinic and Patrick's arrival at Ben Taub Hospital. Further, the EMS records reflect that Patrick was handcuffed to the stretcher after being combative.[66] Thus, video footage of the hallways, elevator, and loading dock would add little to the remaining claims for deliberate indifference to medical needs and would be cumulative of the EMS and medical records.

Likewise, although Plaintiffs maintain that video footage would have revealed the "reactions" of a guard in the picket, such "reactions" would not be competent evidence of *what a*

---

[66] *See* EMS Records, Doc. No. 310-21 at 2 (under seal).

*guard actually saw or observed.* At best, such video would be fodder for conjecture about what a guard was observing or thinking at any point in time. In this regard, it is highly speculative that such video could show, with any degree of reliability for a jury, whether Malloy conducted the twice-hourly observations through the picket window as he has testified under oath that he conducted.[67] Therefore, Plaintiffs do not show that such video footage would have yielded any relevant, reliable evidence that could aid a jury, much less the "best evidence" of what occurred on or around March 24, 2015.

Accordingly, because Plaintiffs do not show a duty to preserve, bad faith, or that the video would have yielded relevant evidence, Plaintiffs' motion for sanctions based on spoliation must be DENIED.

### B. Motions to Exclude Experts

Defendants move to exclude Roger Clark's expert reports and certain portions of Dr. Gregory Moran's expert reports. Rule 702 governs the admissibility of expert testimony and ensures that "(1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." FED. R. EVID. 702. Rule 702 allows expert testimony if the "specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue." *Id.*

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589 (1993), established a flexible framework to determine whether an expert's testimony complies with Rule 702 both in terms of relevance and reliability. Essentially, a court must ensure that an expert "employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *See Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 152 (1999).

---

[67] *See* Malloy Depo., Doc. No. 310-1, transcript at 86:14-87:10.

Experts may not merely rest on their credentials and give a subjective opinion on relevant issues. *General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). "Without more than credentials and a subjective opinion, an expert's testimony that 'it is so' is not admissible." *Viterbo v. Dow Chemical Co.*, 826 F.2d 420, 424 (5th Cir. 1987). An expert must furnish "some objective, independent validation of [his] methodology[; t]he expert's assurances that he has utilized generally accepted [principles] is insufficient." *Brown v. Illinois Cent. R. Co.*, 705 F.3d 531, 536 (5th Cir. 2013) (internal citations omitted). In addition, "allowing an expert to give his opinion on the legal conclusions to be drawn from the evidence both invades the court's province and is irrelevant." *Owen v. Kerr-McGee Corp.*, 698 F.2d 236, 240 (5th Cir. 1983).

### 1. Roger Clark

In their response to Harris County's motion for summary judgment, Plaintiffs cite Roger Clark's opinions only for the following assertion:

> This policy [of not disciplining officers like Malloy] violates the constitutional rights afforded to all inmates because, where an inmate is seriously ill and a detention officer or other staff does not obtain medical care, the inmate suffers severe, and in this case, fatal, consequences.[68]

Regardless of whether Roger Clark is qualified to opine on training standards in a correctional setting, Clark acknowledged that he is not a medical expert, testified that he was not going to offer medical-related opinions in this case, and, when asked about different responses of a guard based on "serious" versus "non-serious" illnesses, admitted that a guard's response to a

---

[68] Plaintiff's Response to Harris County's MSJ, Doc. No. 309 at ¶ 37 & n. 54 (citing Clark's Report at 10, 15, and 23 ¶¶ 5 [regarding the "inattention to and inadequacy of medical care"] & 7 [regarding Harris County's medical request system and arriving at a legal conclusion of deliberate indifference to inmate's medical needs], and Clark's Depo., Doc. No. 310-26 at 154:10-13). In the portion of the deposition cited for the assertion, Clark also stated that a guard's response to a non-serious illness was "not in [his] calculus." Clark Depo., Doc. No. 310-26 at 153:16-154:20.

non-serious illness was "not in [his] calculus."[69]    The Court concludes that Plaintiffs have not established that Clark is qualified to opine on medical issues. In addition, his opinions in this regard lack reliable methodology, are not relevant, and constitute legal opinions. Therefore, they do not constitute proper expert testimony. *See Brown*, 705 F.3d at 536 (affirming the exclusion of expert testimony where the expert failed to articulate a credible methodology to sustain his conclusions); *Owen*, 698 F.2d at 240 (holding that an expert may not render opinions regarding legal conclusions to be drawn from the evidence). Accordingly, Clark's opinions supporting Plaintiffs' assertion, set forth above, is excluded, and Harris County's motion is GRANTED in this regard.

Likewise, in their response to Malloy's motion for summary judgment, Plaintiffs cite Clark's testimony only once, to support the contention that any requests Patrick placed in the medical box on Monday, March 23, 2015, would not have been picked up until twenty-four hours later.[70] This evidence is not relevant to whether Malloy was aware of facts from which an inference could be drawn that Patrick faced a substantial risk of serious harm. Assuming, without deciding, that Patrick had placed requests in the medical box, there is no evidence that Malloy ever saw or knew that Patrick had placed any requests in the medical box or asked to go to the clinic in relation to his illness. The uncontroverted testimony of Nurse Williamson-Johnson indicates that the Medical Box is locked and that staff at the clinic, not the picket guard, has the key.[71] Because Clark's testimony regarding how long it would take for a request placed in the medical box to reach the clinic is not relevant to the claim against Malloy, it is excluded from consideration on summary judgment. *See Daubert*, 509 U.S. at 590-91 (holding that expert

---

[69] Clark Depo., Doc. No. 295, transcript at 20:5-13, 21:11-24, 22:5-8 (acknowledging that he is not an expert regarding medical issues); Clark Depo., Doc. No. 310-26 at 153:16-154:20.

[70] Plaintiff's Response to Malloy's MSJ, Doc. No. 311 at ¶ 36 & n. 73 (citing Clark's Depo.).

[71] Williamson-Johnson Depo., Doc. No. 310-11, transcript at 120:14-19.

testimony must be relevant and reliable).[72] Accordingly, Malloy's motion is GRANTED regarding Clark's opinion cited in Plaintiffs' response to his motion.

As to the other issues in Defendants' motions regarding Roger Clark, the Court declines to rule on them at this time because Plaintiffs do not rely on or cite to Roger Clark's other opinions in their responses to the motions for summary judgment.[73] Therefore, Defendants' motions in that regard will be DENIED as MOOT.

### 2. Dr. Gregory Moran

Defendants move to exclude portions of Dr. Moran's expert report, specifically, his opinions regarding (1) the standards of Correctional Medicine or whether those standards were met;[74] (2) policies and procedures at the Jail; (3) training at the Jail; (4) actions of policymakers at the Jail; (5) actions of medical personnel at the Jail; (6) the 2009 U.S. Department of Justice Letter; (7) ratio of physicians at the Jail; and (8) "risk of contagion" of disease at the Jail. Defendants contend that although Moran may be competent to opine about meningitis and its proper treatment, he is not an expert in jail medicine or the administration of a jail.

In his deposition, Dr. Moran asserted that he is an infectious disease and emergency room expert but acknowledged that he is not an expert on police practices, custody medicine, jail triage procedures, Texas Commission on Law Enforcement regulations, or the ratio of physicians to

---

[72] Stated another way, the presence or absence of I-60s in the medical box from Patrick does not raise a material fact issue against Malloy because there is no evidence Malloy was aware of them.

[73] To the extent that Plaintiffs rely on Roger Clark's opinions regarding the Jail inspection, as previously discussed, Plaintiffs do not establish that Harris County had a duty to preserve, acted with bad faith, or that the video footage that was not preserved would have yielded any relevant evidence; therefore, Defendants' objections in this regard are moot.

[74] Notably, Moran testified in his deposition that he did not believe that the Jail clinic or the nurse handling Patrick's treatment fell below the standard of care. *See* Moran Depo., Doc. No. 301-1, transcript at 91:8-21, 186:24-187:2. Moran's deposition testimony renders his opinions regarding whether the correctional care standards were met in this case moot.

inmates at the Jail relative to other jail systems.[75]  He also testified that the standard of care for training officers regarding meningitis in a correctional setting would not be in his "realm of expertise."[76]  Therefore, Defendants' motion to exclude the portions of Moran's opinions that deal with the administration of a jail, including the 2009 U.S. Department of Justice Letter, training officers in a correctional setting, and physician ratios at the Jail, is GRANTED and those opinions will be excluded and will not be considered as competent expert testimony in this case.

## C.  Plaintiffs' Motions to Strike the Affidavits of Pair and Sunder

The Court has not relied on this evidence in making its determination on the pending summary judgment motions.[77]  Accordingly, Plaintiffs' Motions to Strike the Affidavits of Pair and Sunder are DENIED as MOOT.

## D.  Plaintiffs' Motion to Strike the Affidavit of Major Dougherty

Plaintiffs move to strike Major Dougherty's affidavit, contending that he was not properly disclosed.  Defendants counter that Major Dougherty is the substitution for their corporate representative, Major Mike Smith, that they timely disclosed on October 18, 2016 and again on February 27, 2017.  Dougherty was disclosed in the Second Amended Disclosures before the end of the discovery period on January 30, 2019 and by affidavit on December 12, 2018.[78]

---

[75] Moran Depo., Doc. No. 301-1, transcript at 45:19-47:13.  Moran's Declaration (Doc. Nos. 311-3, 314-6), created after the summary judgment motions were filed and in response to Defendants' motions, does not alter the Court's determination that Moran has acknowledged in previous testimony that he is not an expert on these issues.  *See Wilson v. Woods*, 163 F.3d 935, 937 (5th Cir. 1999) (affirming the district court's determination that an expert in one field was not an expert in another field and noting that "[a] district court should refuse to allow an expert witness to testify if it finds that the witness is not qualified to testify in a particular field or on a given subject") (citing *Holbrook v. Lykes Bros. Steamship Co., Inc.*, 80 F.3d 777, 781 (3d Cir.1996)).

[76] Moran Depo., Doc. No. 301-1, transcript at 59:12-21; 263:2-19.

[77] However, to the extent that either one of these witnesses is a "Custodian of Records," Defendants timely disclosed Custodians of Records in their initial disclosures.  Therefore, their testimony is admitted for the purpose of attesting to the authenticity of Harris County business records, if applicable.

[78] *See* Dougherty Aff., Doc. No. 264-3; *see also* 2d Am. Disclosures, Doc. No. 318-3 at 7 (witness #122).

In Dougherty's December 12, 2018 Affidavit, he discloses that he is the Major in charge of Harris County Justice Housing Bureau for the Jail.[79] The record reflects that the Plaintiffs did not object to the inclusion of this affidavit or Dougherty as a witness based on the failure to disclose him in previous Rule 26 disclosure statements.[80] Plaintiffs therefore cannot claim surprise regarding Dougherty as a witness in charge of Harris County Justice Housing Bureau for the Jail. *See, e.g., Bitterroot Holdings, L.L.C. v. MTGLQ Inv'rs, L.P.*, 648 F. App'x 414, 419 (5th Cir. 2016) (holding that there was no surprise regarding an undisclosed witness because her affidavit was previously submitted, without objection, in support of an earlier motion).

Even if Defendants were late in disclosing Major Dougherty as Plaintiffs contend, the Court concludes that his affidavit should be admitted as competent summary judgment evidence. Rule 37 provides, in pertinent part: "If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at trial, unless the failure was substantially justified or is harmless." FED. R. CIV. P. 37(c)(1). "[W]here a district court allows non-disclosed evidence to be used, [the Fifth Circuit] look[s] to four factors in determining whether the district court was within its discretion in permitting the introduction of the evidence: '(1) the importance of the evidence; (2) the prejudice to the opposing party of including the evidence; (3) the possibility of curing such prejudice by granting a continuance; and (4) the explanation for the party's failure to disclose.'" *Bitterroot Holdings, L.L.C.*, 648 F. App'x at 419 (quoting *Tex. A & M Research Found. v. Magna Transp., Inc.*, 338 F.3d 394, 402 (5th Cir. 2003)).

Regarding the importance of the evidence, Major Dougherty's report clarifies that the twice-hourly observations by the picket officers are conducted, many times, through the picket

---

[79] *See* Dougherty Aff., Doc. No. 264-3.

[80] *See* Doc. No. 270 (no objection to Dougherty's Affidavit on the basis that he had not been previously disclosed as a witness).

windows because a picket officer must not leave the picket unmanned. Dougherty's report is also helpful because it provides background and explains the practices of the staff and Harris County, such as: the number of inmates processed through the Jail; whether the Jail complies with the Texas Commission on Jail Standards and passes United States Marshal Service inspections; and whether the Jail's policies and procedures assured Patrick access to medical care. Because such background and evidence regarding the twice-hourly observations and the standards at the Jail are relevant and helpful to the resolution of this case, this evidence is important. The first factor favors admission.

In addition, Plaintiffs do not show prejudice in admitting Major Dougherty's testimony. Plaintiffs have been on notice since October 18, 2016, when Major Mike Smith and several others were disclosed as persons with "knowledge about the policies and procedures of the Harris County Sheriff's Office,"[81] that Defendants would likely present testimony regarding policies and procedures at the Harris County Jail. Plaintiffs do not allege or show that they noticed Major Mike Smith's deposition or any other corporate representative who would testify regarding Jail policies and procedures under Rule 30(b)(6), and, therefore, do not show prejudice that Smith's successor, Major Dougherty, submitted the testimony as the Major in charge of Harris County Justice Housing Bureau for the Jail regarding policies and procedures at the Jail. This factor favors admission of Major Dougherty's affidavit.

Finally, counsel for Harris County explains that "[he] only learned about Major Dougherty's role overseeing the 701 Jail in December, and he was promptly disclosed on December 12 by affidavit in Doc. 264-3."[82] Counsel further contends that Dougherty's predecessor, Major Mike Smith, was disclosed in Harris County's Initial and First Amended

---

[81] Harris County's Initial Disclosures, Doc. No. 318-1 at 6-7.
[82] Doc. No. 318 at 9.

Disclosures, and in Malloy's Initial Disclosures, that were served on October 18, 2016, February 27, 2017, and September 28, 2018, respectively.[83] Defendants tender a valid reason for the failure to disclose Major Dougherty prior to December 2018, and this factor also favors admission of the evidence.

Considering the importance of the evidence, the lack of prejudice to Plaintiffs, and the explanation for the late disclosure, the Court concludes that Major Dougherty's affidavit should be admitted as competent summary judgment evidence. Accordingly, Plaintiffs' motion to strike Major Dougherty's affidavit is DENIED.[84]

### E. Plaintiffs' Motion to Strike Malloy's Expert Reports as Hearsay

Plaintiffs move to strike several of Malloy's expert reports because Malloy failed to include the required verification when he attached the reports to his motion. Although Plaintiffs are correct that unverified expert reports are inadmissible as hearsay, *see Provident Life & Accident Ins. Co. v. Goel*, 274 F.3d 984, 1000 (5th Cir. 2001), Malloy points out that Harris County timely filed these identical expert reports with the proper verification, and now incorporates those into his motion by reference. Malloy contends that he should be allowed to cure the defect and that these reports are competent summary judgment evidence because they are properly in the summary judgment record.

Plaintiffs argue that Malloy's attempt to cure was not timely and assert that the court should not allow him to cure this defect. As for timeliness, Plaintiffs were presented with verified copies of all of these reports in connection with Harris County's motion for summary

---

[83] *See* Doc. Nos. 318-1 at 6-7; 318-3 at 10, and 318-4 at 7.
[84] To the extent that Plaintiffs challenge Dougherty's affidavit as an undisclosed expert report, Dougherty's testimony regarding whether the picket officers may conduct their observations through the picket window, among other things, are matters within his personal knowledge derived from duties he holds at the Jail; he is a fact or lay opinion witness in this regard. *See United States v. Valencia*, 600 F.3d 389, 416 (5th Cir. 2010) (citing *Nat'l Hispanic Circus, Inc. v. Rex Trucking, Inc.*, 414 F.3d 546, 551-52 (5th Cir. 2005)).

judgment; they had actual notice of the verifications and were served with the expert reports in admissible form in the record on March 4, 2019. Thus, they cannot (and do not) contend that they were surprised, or even harmed, by this oversight. The Court concludes that there was no prejudice or unfair surprise to Plaintiffs by Malloy's initial omission of the verifications and, accordingly, will permit Malloy to incorporate the properly verified reports by reference. *See* FED. R. CIV. P. 56(e); *see also Exxon Mobil Corp. v. United States*, 108 F. Supp. 3d 486, 530 n. 33 (S.D. Tex. 2015) (allowing experts to submit declarations incorporating by reference their earlier-filed, unsworn reports); *Molina v. Collin Cnty., Texas*, No. 4:17-CV-00017, 2017 WL 4812453, at *1 (E.D. Tex. Oct. 25, 2017) (holding that when a party attaches unsworn expert reports as summary judgment evidence, such deficiencies are curable by the filing of the experts' sworn declarations) (citing *Greene v. Toyota Motor Corp.*, No. 3:11-cv-207-N, 2014 WL 12575716, at *3 n.5 (N.D. Tex. June 2, 2014); *Straus v. DVC Worldwide, Inc.*, 484 F. Supp.2d 620, 634 (S.D. Tex. 2007)); *Allstate Ins. Co. v. Helmsco Inc.*, No. 6:15-CV-114, 2016 WL 3223325, at *2 (W.D. Tex. Feb. 16, 2016) (allowing a litigant to cure the lack-of-verification-defect in the expert reports). Accordingly, Plaintiffs' motion to strike (Doc. No. 308) is DENIED as MOOT.

### F.     Unilateral Depositions

Plaintiffs conducted several "Examinations Under Oath" of witnesses who were Patrick's former cellmates. Defendants object to these as "unilateral depositions" because they received no notice of these depositions, were not present at these depositions, and, concomitantly, were not permitted to cross-examine or object to Plaintiffs' leading questions.

The Court has carefully reviewed the witness statements and concludes that they do not raise a genuine issue of material fact regarding whether either Malloy or Harris County is

entitled to summary judgment, as set forth below. Accordingly, Defendants' objections to this evidence are OVERRULED as MOOT.

## III.   MOTIONS FOR SUMMARY JUDGMENT—LEGAL STANDARDS

### A.   Rule 56

To be entitled to summary judgment, the pleadings and summary judgment evidence must show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56. The moving party bears the burden of initially pointing out to the court the basis of the motion and identifying the portions of the record demonstrating the absence of a genuine issue for trial. *Duckett v. City of Cedar Park, Tex.*, 950 F.2d 272, 276 (5th Cir. 1992). Thereafter, "the burden shifts to the nonmoving party to show with 'significant probative evidence' that there exists a genuine issue of material fact." *Hamilton v. Seque Software, Inc.*, 232 F.3d 473, 477 (5th Cir. 2000) (quoting *Conkling v. Turner*, 18 F.3d 1285, 1295 (5th Cir. 1994)).

The nonmovant's burden is not met by mere reliance on the allegations or denials in the nonmovant's pleadings. *See Morris v. Covan Worldwide Moving, Inc.*, 144 F.3d 377, 380 (5th Cir. 1998); *see also Johnston v. City of Houston*, 14 F.3d 1056, 1060 (5th Cir. 1994) ("Unsworn pleadings, memoranda or the like are not, of course, competent summary judgment evidence."). Likewise, the nonmoving party "cannot satisfy this burden with conclusory allegations, unsubstantiated assertions, or only a scintilla of evidence." *Freeman v. Tex. Dep't of Crim. Justice*, 369 F.3d 854, 860 (5th Cir. 2004) (citations omitted).

In the absence of proof, a reviewing court will not assume that the nonmovant could or would prove the necessary facts. *See McCallum Highlands, Ltd. v. Washington Capital Dus, Inc.*, 66 F.3d 89, 92 (5th Cir. 1995), *revised on other grounds upon denial of reh'g*, 70 F.3d 26

(5th Cir. 1995). The Court may grant summary judgment on any ground supported by the record, even if the ground is not raised by the movant. *U.S. v. Houston Pipeline Co.*, 37 F.3d 224, 227 (5th Cir. 1994).

## B. Eighth Amendment Deliberate Indifference

"[D]eliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain' [] proscribed by the Eighth Amendment." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976) (internal citation omitted). To succeed on a claim under 42 U.S.C. § 1983 for deliberate indifference to serious medical needs, a plaintiff must show both: (1) that the defendant was aware of facts from which he may draw an inference that excessive risk to the prisoner's health or safety exists; and (2) that the defendant actually drew the inference that such potential for harm existed and disregarded the risk. *Farmer v. Brennan*, 511 U.S. 825, 837, 847 (1994).

"[D]eliberate indifference cannot be inferred merely from negligent or even a grossly negligent response to a substantial risk of serious harm." *Thompson v. Upshur County, Tex.*, 245 F.3d 447, 459 (5th Cir. 2001). Rather, a plaintiff must show that the prison official "knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it." *Farmer*, 511 U.S. at 847.

Deliberate indifference is an "extremely high standard to meet." *Domino v. Texas Dep't of Criminal Justice*, 239 F.3d 752, 756 (5th Cir. 2001). An official's "failure to alleviate a significant risk that he should have perceived but did not" does not constitute Eighth Amendment deliberate indifference. *Farmer*, 511 U.S. at 838. Absent exceptional circumstances, an incorrect diagnosis, unsuccessful medical treatment, acts of negligence, medical malpractice, or a prisoner's disagreement with his medical treatment are insufficient to meet the standard. *Gobert*

*v. Caldwell*, 463 F.3d 339, 346 (5th Cir. 2006); *Domino*, 239 F.3d at 756. A plaintiff must show that the defendant "refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs." *Brewster v. Dretke*, 587 F.3d 764, 770 (5th Cir. 2009) (quotation marks omitted)).

## IV.   MOTIONS FOR SUMMARY JUDGMENT—DISCUSSION

### A.   Malloy

Plaintiffs do not point to evidence showing that Malloy was aware that Patrick was ill before 2 p.m. on the day Patrick died. Taking the evidence in the light favorable to the Plaintiffs, Malloy was aware of the following facts shortly after 2 p.m. when he conducted count: (1) Patrick was not feeling well; (2) Patrick asked to be excused from work; and (2) Patrick told another inmate that he had been vomiting. Malloy testified that nothing indicated to him that Patrick had an immediate medical need at that point and that he thought Patrick just needed to rest.[85] As the afternoon progressed, Malloy was aware that Patrick remained in his bunk all afternoon and refused his tray at 4:30 p.m., but overheard Patrick tell the floor worker that he was okay. After the rest of Patrick's cellmates returned from work, Malloy was alerted to Patrick's medical need because his cellmates rang the buzzer notifying Malloy that Patrick needed help. Although Plaintiffs question, in argument, whether Malloy acted fast enough, Plaintiffs do not controvert the competent summary judgment evidence that Malloy called for help immediately after the inmates told him Patrick needed help.[86] The evidence does not support Plaintiffs' contention that "Malloy did nothing."

---

[85] Malloy Aff., Doc. No. 296-17 at 2; Malloy IAD Transcript, Doc. No. 310-6 at 9:15-10:7 (under seal).
[86] *See* Eisenbach IAD Transcript, Doc. No. 310-17 at 4:13-25 (stating that Eisenbach "told Malloy twice, and he called right then each time"); Malloy IAD Transcript, Doc. No. 310-6 at 18:17-19:25; Turner IAD Statement, Doc. No. 297-1 at 22; Enriquez IAD Statement, Doc. No. 297-1 at 23.

Further, Plaintiffs do not point to evidence that Patrick ever asked Malloy for permission to go to the clinic or that Malloy ever knew that Patrick placed any I-60 medical requests in the medical box.[87] There is no indication that Patrick ever asked Malloy to see a doctor in the days before his death, or when he requested to be excused from his laundry shift, or at any time thereafter. There is no evidence that Patrick exhibited any emergent symptoms that afternoon until he stumbled and fell after his cellmates returned from work.[88]

Patrick tragically died from a rare form of acute bacterial meningitis that, by all medical expert accounts, is not always clinically obvious to medical professionals, much less to lay persons.[89] In fact, the doctors at Ben Taub Hospital did not definitively diagnose meningitis in the hours that they cared for Patrick before he died; meningitis was one of several possibilities in the differential diagnosis that night.[90]

All of the medical experts acknowledge that malaise and vomiting are non-specific symptoms that could mean something as benign as a minor cold or flu to something more serious.[91] In fact, Dr. Gregory Moran, Plaintiffs' medical expert, testified that there are many

---

[87] See Malloy IAD Transcript, Doc. No. 310-6 at 14:6-15:9; Malloy IAD Statement, Doc. No. 299-14 at 2.

[88] For example, there is no evidence that Patrick was actively vomiting on the afternoon of March 24, 2015; no evidence of Patrick having a seizure; no evidence that Patrick was bleeding; and no evidence of altered mental state during Malloy's shift until after Patrick fell on the way back from the bathroom, when the inmates alerted Malloy and Malloy responded by calling for help.

[89] Moran Depo., Doc. Nos. 299-9/301-1, transcript at 138:14; Vilke Report, Doc. No. 296-26 at 9-10 (explaining that meningitis patients are often sent home from the emergency department with a diagnosis of cold or flu only to return hours later fully septic and toxic and that meningitis patients can decompensate that quickly after initially presenting with non-descript symptoms); Hamill Report, Doc. No. 296-24 at 9 (explaining that it was not clear that any physician would have diagnosed meningitis in Patrick up until he became visibly ill during the evening of March 24); Ly Report, Doc. No. 296-25 at 12 ¶ 7.

[90] See Ben Taub Medical Records, Doc. No. 300-5 at 9 (under seal).

[91] See, e.g., Moran Depo., Doc. Nos. 299-9/301-1, transcript at 10:12-15, 140:12-20, 173:7-174:12, and 179:16-20; Ly Aff., Doc. No. 296-25 at 2 (opining that Patrick's common, non-specific complaints would not have alerted a reasonable office to believe Patrick was seriously ill); Ly Report, Doc. No. 296-25 at 12 ¶ 7; Hamill Report, Doc. No. 296-24 at 9 (noting that vomiting "is such a non-specific symptom that to a lay person, it would not have triggered any concern"); Vilke Report, Doc. No. 296-26 at 10-11 (opining

reasons a person may vomit, and that Malloy "didn't know [Patrick] had a serious illness. He knew he had some illness."[92] Moran also testified that he would not expect a layperson to think that someone who says they do not feel well, had vomited, and did not want to go to work had a serious medical illness.[93] In his deposition, Moran faults Malloy because Patrick's illness "could potentially be serious" and that it would have been appropriate to have a medical assessment done to determine whether Patrick's illness was something significant or not.[94]

In other words, Plaintiffs seek to hold Malloy responsible for the failure to alleviate a significant risk that they contend Malloy *should have perceived*, but did not. The "failure to alleviate a significant risk that an official should have perceived but did not," does not constitute Eighth Amendment deliberate indifference as a matter of law. *See Farmer*, 511 U.S. at 838. Plaintiffs contend that Malloy should have perceived that Patrick's general symptoms of vomiting (which had evidently concluded before 2 p.m. and was not ongoing), not feeling well, not wanting to go to work, and not eating his evening meal meant that Patrick could *potentially* be seriously ill and that Malloy should have forced Patrick to seek medical care in the early afternoon, even in the absence of any request by Patrick to Malloy for medical care. However, Plaintiffs present no evidence that Malloy "actually drew the inference" that Patrick faced a substantial risk of serious harm, as the law requires. *Id.* at 837, 847.

The Fifth Circuit has previously rejected the argument, which Plaintiffs assert in this case, that a government employee should have known that an inmate or arrestee needed a doctor

---

that a correctional officer would not recognize a significant illness from Patrick's outward symptoms when he asked to stay back from work).

[92] Moran Depo., Doc. No. 299-9/301-1, transcript at 173:7-17, 174:11-12, 310:5-23. Moran's later-created Declaration does not overcome his earlier deposition testimony where he acknowledges that Patrick presented with vague, general symptoms early in the afternoon and that Malloy did not know Patrick had a serious illness, just that he had some illness, at that point.

[93] *Id.*, transcript at 310:5-23.

[94] *Id.*, transcript at 175:1-10.

where the inmate or arrestee presents with ambiguous, non-descript symptoms that could mean anything from something minor to something more serious. *See, e.g., Trevino v. Hinz*, 751 F. App'x 551, 555 (5th Cir. Nov. 27, 2018) (unpublished op.) (holding that "an officer's failure to immediately recognize ambiguous symptoms as a medical emergency does not amount to deliberate indifference" where an arrestee was vomiting and acting like she was having a seizure and that, "'as a matter of common sense, vomiting does not always indicate medical distress in the sense that it requires immediate medical attention'" (citation omitted)); *Estate of Cheney v. Collier*, 560 F. App'x 271, 274 (5th Cir. Mar. 24, 2014) (unpublished op.) (holding no deliberate indifference where nurse ignored inmate's flulike symptoms of paleness, body fatigue, chills, lack of appetite, and one or two instances of vomiting because such symptoms were consistent with a severe cold or flu and the nurse therefore was not aware of a substantial risk of serious harm until the inmate's vitals were dangerously abnormal, at which point she sought emergency treatment but the inmate died); *Estate of Allison v. Wansley*, 524 F. App'x 963, 972 (5th Cir. May 15, 2013) (unpublished op.) (affirming summary judgment on deliberate indifference where officers knew that arrestee was very intoxicated, had a history of drug abuse and suicide attempts, was unsteady with slurred speech, and defendants allowed her to "sleep it off" because they did not believe she was having a medical emergency); *Self v. City of Mansfield, Texas*, 369 F. Supp. 3d 684, 699 (N.D. Tex. 2019) (holding that defendants were not deliberately indifferent to plaintiff's medical needs where, four hours before his death by drug-induced cardiac arrest, plaintiff had had a seizure, could not walk on his own, and was in and out of consciousness because his non-descript symptoms were mistaken for drunkenness rather than a drug overdose); *accord Bruner-McMahon v. Jameson*, 566 F. App'x 628, 634 (10th Cir. May 7, 2014) (unpublished op.) (affirming summary judgment against representatives of the estate of an

inmate who died from complications from bacterial meningitis, where guards were aware that the inmate exhibited flu-like symptoms and was acting strangely but did not get him timely medical attention, holding that there was no evidence that any of the guards appreciated the risk of a serious or fatal medical condition and disregarded that risk).[95]

Plaintiffs' reliance on *Stewart v. Tilley*, 2017 WL 5665336, at *8 (W.D. Tex. Nov. 27, 2017) (citing *Austin v. Johnson*, 328 F.3d 204, 210 (5th Cir. 2003)), where the district court denied summary judgment on deliberate indifference for several guards, is misplaced. In *Stewart*, guards took away a disabled plaintiff-inmate's wheelchair, causing him to hit his head on the floor and lose consciousness. *Id.* at *1. The plaintiff in *Stewart* remained unconscious for 14 hours before anyone called for a doctor. *Id.* The court found that the guards in question were aware of Stewart's medical condition and denied him medical care. *Id.* at *7. In sharp contrast, Plaintiffs present no competent summary judgment evidence that Malloy delayed or failed to act once he was aware of Patrick's serious medical need.[96]

Although Plaintiffs point to the varying accounts of when the inmates returned from work and how long it took for Ervin to arrive at the cell after Malloy called for help, the relevant

---

[95] Indeed, a review of cases from other circuits involving the intersection between the concept of deliberate indifference and an individual with developing or possible meningitis finds that (with one exception based on vastly more egregious facts) circuits have found no deliberate indifference in similar situations. *See Bruner-McMahon v. Jameson*, 566 F. App'x 628, 634 (10th Cir. May 7, 2014) (as stated in the text, a case with facts quite similar to this case); *Nam Dang v. Sheriff, Seminole Cnty., Fla.*, 871 F.3d 1272 (11th Cir. 2017); *Popoalii v. Corr. Med. Servs.*, 512 F.3d 488 (8th Cir. 2008); *Estate of Chance ex rel Humphreys v. First Corr. Med. Inc.*, 329 F. App'x 340 (3d Cir. 2009); *Mabry v. Antonni*, 289 F. App'x. 895 (6th Cir. 2008); *but see Thomas v. Cook Cnty. Sheriff's Dep't*, 604 F.3d 293 (7th Cir. 2010).

[96] Similarly, *Austin v. Johnson*, 328 F.3d 204, 210 (5th Cir. 2003), is inapposite. In *Austin*, officials had reason to know that the unconscious minor attending a youth offender boot camp needed medical attention from dehydration in the Texas June heat because they forced him to exert himself physically despite his complaints and observed him repeatedly falling behind in the exercise course and actively vomiting. *Id.* In contrast, Malloy had no reason to know that Patrick's non-descript symptoms were anything more serious than a minor cold or flu; in fact, there is no indication that Patrick was actively vomiting that afternoon, and Malloy overheard Patrick tell the floor worker that he did not want his dinner at 4:30 p.m. Further, as discussed above, unlike the defendants in *Austin* and *Stewart*, Malloy did not delay his response to Patrick's serious medical needs; as soon as he was apprised that Patrick was seriously ill, he called for help.

timeline regarding the deliberate indifference inquiry concerning Malloy is the time between when he was aware of Patrick's serious medical need—when the inmates pressed the buzzer alerting Malloy— and the time he took to call for help. The uncontroverted evidence establishes that Malloy called for help right away. Malloy did not disregard the risk; he acted promptly once he was apprised of it. In sum, Plaintiffs do not raise a fact issue that Malloy disregarded a substantial risk of serious harm to Patrick by refusing to treat him, ignoring his complaints, intentionally mistreating him, or engaging in any similar conduct that demonstrated a wanton disregard for his medical needs. *Gobert*, 463 F.3d at 346; *Domino*, 239 F.3d at 756. Accordingly, Plaintiffs do not raise a fact issue that Malloy acted with deliberate indifference to Patrick's serious medical needs.

To the extent that Plaintiffs argue that Malloy did not actually perform twice-hourly observations as required, they fail to raise a material fact question regarding deliberate indifference. Plaintiffs do not point to competent summary judgment evidence to controvert Malloy's testimony that he conducted these observations every thirty minutes from the picket.[97]

Even if, for sake of argument, Malloy had not conducted the twice-hourly observations as required, "a prison official's failure to follow prison policies or regulations does not establish a violation of a constitutional right." *Lewis v. Sec. of Pub. Safety and Corrections*, 870 F.3d 365, 369 (5th Cir. 2017) (citations omitted); *see also Walker v. Upshaw*, 515 F. App'x 334, 337 (5th Cir. 2013) (holding that the guards' failure to conduct the required fifteen-minute checks on a suicide watch inmate showed negligence but not deliberate indifference); *Estate of Pollard v. Hood County, Texas*, 579 F. App'x 260, 265 (5th Cir. 2014) (holding that the guards' failure to

---

[97] In that regard, Malloy testified that these observations are "face to face" unless the inmate's back is turned and that Patrick was in different positions on his bunk. *See* Malloy Depo., Doc. No. 299-7, transcript at 60:2-25, 63:1-16; Malloy Depo., Doc. No. 310-1, transcript at 24:9-15, 86:10-87:10. Major Dougherty also confirmed that these "face to face" observations may be conducted through the picket window. Dougherty Aff., Doc. No. 296-1 at 10.

comply strictly with the fifteen-minute observation orders and to view and remove the laundry bag from a suicide-watch inmate's cell reflected possible negligence, but not deliberate indifference to the inmate's known suicide risk).[98]  At most, such a failure reflects negligence, not deliberate indifference.  Plaintiffs do not raise a fact issue that Malloy was deliberately indifferent to Patrick's serious medical needs, and, therefore, do not show that Malloy violated Patrick's constitutional rights.  Malloy is entitled to summary judgment on Plaintiffs' claims.

Malloy has also asserted qualified immunity.  "The doctrine of qualified immunity shields officials from civil liability so long as their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (per curiam) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)).  Clearly established means that "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987).  "[W]hether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the 'objective legal reasonableness' of the action." *Id.* at 639 (citation omitted).  "In evaluating a claim of qualified immunity, the district court is to make a determination of the objective reasonableness of the official's act as a matter of law." *Mangieri v. Clifton*, 29 F.3d 1012, 1016 (5th Cir. 1994); *see also Hare v. City of Corinth*, 135 F.3d 320, 328 (5th Cir. 1998) (citing *Mangieri* and explaining that the qualified immunity analysis requires a determination of whether the official's actions were objectively reasonable as a matter of law).

As explained above, Plaintiffs do not raise a fact issue that Malloy violated Patrick's

---

[98] Similarly, Plaintiffs' allegations that Malloy failed to follow Jail procedures involving sufficiently detailing the pass-on logs, calling the Laundry Room to secure permission before allowing Patrick to skip work, or making him get a medical pass to skip work, do not constitute a constitutional violation. *Lewis*, 870 F.3d at 369.

constitutional rights, and, therefore, fail to overcome Malloy's assertion of qualified immunity on that basis alone.

Even if Plaintiffs had raised a fact issue on a constitutional violation, they do not establish that every reasonable officer would understand that Malloy's actions were unlawful in light of clearly established law at the time of Patrick's death. *See McLin v. Ard*, 866 F.3d 682, 695-96 (5th Cir. 2017) (holding that a plaintiff must show that the law so clearly and unambiguously prohibited the official's conduct such that *every* reasonable officer would have known that the officer's actions violated plaintiff's constitutional right). As discussed previously, Patrick did not exhibit emergent symptoms when he told Malloy that he wanted to stay in from work; Malloy testified that he was not aware that Patrick had a serious medical need but instead thought he had some minor cold or flu and just needed to rest. Plaintiffs do not point to clear precedent establishing that a guard acts unconstitutionally when he does not make an inmate go to the medical clinic where the inmate appears only to have a minor cold or flu and does not request to go to the clinic. A reasonable officer could have believed that Malloy's actions were lawful under the totality of the circumstances here. Accordingly, Plaintiffs do not meet their burden to overcome Malloy's assertion of qualified immunity. Therefore, Malloy is also entitled to qualified immunity regarding Plaintiffs' claims.

**B.      Harris County**

To establish municipal liability under § 1983 for deliberate indifference to an inmate's medical needs, a plaintiff must first show that a municipal employee committed a constitutional violation—here, deliberate indifference to Patrick's known serious illness. *Estate of Pollard*, 579 F. App'x at 267 (citing *Scott v. Moore*, 114 F.3d 51, 54 (5th Cir.1997) (en banc)). Once a plaintiff establishes this underlying constitutional violation, liability can be extended to the

municipality if the plaintiff can show that the violation resulted from a municipal policy or custom "adopted or maintained with objective deliberate indifference to the detainee's constitutional rights." *Id.* (citation omitted); *see also Brumfield v. Hollins*, 551 F.3d 322, 331 (5th Cir. 2008). "'If a plaintiff is unable to show that a county employee acted with subjective deliberate indifference, the county cannot be held liable for an episodic act or omission.'" *Estate of Pollard*, 579 F. App'x at 267 (quoting *Anderson v. Dallas Cnty., Tex.*, 286 F. App'x 850, 860 (5th Cir. 2008)); *see also Olabisiomotosho v. City of Houston*, 185 F.3d 521, 529 (5th Cir.1999).

Plaintiffs argue that Harris County is liable because it ratified Malloy's decisions by not disciplining him. They contend further that Harris County's policies or lack of training or supervision caused Malloy's deliberate indifference to Patrick's medical needs, and that Harris County has a custom of allowing guards to violate its policies that are in place to provide inmates with adequate medical care. As set forth in detail above, however, Plaintiffs do not raise a fact issue on their claims against Malloy. Similarly, Plaintiffs do not raise a fact issue that any other Harris County employee acted with deliberate indifference.[99] Plaintiffs fail to show an underlying constitutional violation.

Without an underlying constitutional violation, Plaintiffs' claims against Harris County fail as a matter of law. *See Piotrowski v. City of Houston,* 237 F.3d 567, 578 (5th Cir. 2001) (holding that a plaintiff must identify a policymaker, a policy or custom, and *a violation of constitutional rights* whose "moving force," or cause, is the policy or custom (emphasis added));

---

[99] As noted earlier, Moran testified that he did not believe that the Jail clinic or the nurse handling Patrick's treatment fell below the standard of care. *See* Moran Depo., Doc. No. 301-1, at transcript 91:8-21, 186:24-187:2. In that regard, Moran opines in his Report that he believes to a medical certainty that, sometime in the early to mid-afternoon on March 24, 2015, "it was too late to save Patrick." Moran Report, Doc. No. 261-7 at 6. The Court previously found that Plaintiffs had failed to state a claim for which relief may be granted against any of the medical staff (and any of the other Harris County employees except Malloy and Ervin), but gave Plaintiffs leave to amend their complaint if they could allege facts to state such a claim. Plaintiffs did not avail themselves of the opportunity to allege sufficient facts then, and they do not raise a fact issue against any of those dismissed defendants now.

*Estate of Pollard*, 579 F. App'x at 267 (holding that because the plaintiffs were unable to establish any underlying constitutional violation by any municipal employee, the claims against the city also failed as a matter of law); *Olabisiomotosho*, 185 F.3d at 526 ("To [hold a municipality liable], the plaintiff must demonstrate a municipal employee's subjective indifference and additionally that the municipal employee's act 'resulted from a municipal policy . . . adopted . . . with objective deliberate indifference.'"); *Corley v. Prator*, 290 F. App'x 749, 752 (5th Cir. Aug. 25, 2008) (same); *Harris v. Brazos County*, 264 F.3d 1141, 2001 WL 822684, *1 (5th Cir. Jun. 28, 2001) (not selected for publication) (holding that because plaintiff did not show that county officials denied her adequate medical care, she did not establish a claim against the county). An underlying constitutional violation is likewise required to show a failure to train. *See Whitley v. Hanna*, 726 F.3d 631, 648 (5th Cir. 2013) (explaining that "inadequate supervision, failure to train, and policy, practice or custom claims fail without an underlying constitutional violation"); *see also Doe ex rel. Magee v. Covington Cnty. Sch. Dist. ex rel. Keys*, 675 F.3d 849, 866–67, 869 n.13 (5th Cir. 2012) (same).

In sum, Plaintiffs fail to show an underlying constitutional violation or that any Harris County policy, custom, training or practice was the moving force of a deprivation of Patrick's constitutional rights. Accordingly, Harris County is entitled to summary judgment on Plaintiffs' claims.

## V.    CONCLUSION AND ORDER

While this Court finds the circumstances surrounding Patrick Green's final hours to be tragic, it does not find that the Defendants violated Mr. Green's rights and certainly does not find that they acted with deliberate indifference. Mr. Green's symptoms were vague at best. He never asked the guard on duty, Michael James Malloy, to see a doctor, and once it was

determined that he might really be in need of medical attention, Malloy acted immediately.

Based on the foregoing, the Court **ORDERS** as follows:

1.    Harris County's Motion for Summary Judgment (Doc. No. 296) is **GRANTED**, and Plaintiffs' claims against it are **DISMISSED with PREJUDICE.**

2.    Michael James Malloy's Motion for Summary Judgment (Doc. No. 299) is **GRANTED**, and Plaintiffs' claims against him are **DISMISSED with PREJUDICE**.

3.    Plaintiff's Motion on Spoliation After Jail Inspection (Doc. No. 291) is **DENIED**, and Harris County's Motion regarding Jail Inspection (Doc. No. 292) is **GRANTED**.

4.    Defendants' Joint Motions to Exclude Testimony of Plaintiffs' Expert Roger Clark (Doc. No. 294) is **GRANTED**, in part, as explained above, and is otherwise **DENIED as MOOT**.

5.    Defendants Motion to Exclude Portions of Dr. Gregory Moran's Testimony (Doc. No. 301) is **GRANTED**.

6.    Plaintiffs' Motion to Strike Reports of Experts as Hearsay (Doc. No. 308) is **DENIED**.

7.    Plaintiffs' Motions to Strike Affidavits of Bryan Pair and Laxman Sunder (Doc. Nos. 305 & 306) are **DENIED as MOOT**.

8.    Plaintiffs' Motion to Strike Affidavit of Patrick Dougherty (Doc. No. 307) is **DENIED**.

9.    Plaintiffs' Motion for Leave to File a Response to Objections to MSJ Evidence (Doc. No. 326) is **GRANTED**.

10.    Any objections to the evidence that were not ruled upon in the discussion above

are **OVERRULED as MOOT**.

11.    A Final Judgment shall issue by separate Order.

The Clerk will provide a copy of this order to the parties.

SIGNED at Houston, Texas, this _26th_ day of June, 2019.

ANDREW S. HANEN
UNITED STATES DISTRICT JUDGE